# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MITCHELL McPHERSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-2913 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| McDONALD'S USA, LLC, and | ) | |
| McDONALD'S CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Mitchell McPherson, a black man, fed burgers and fries to the public as a McDonald's franchisee for over three decades. But he doesn't believe that he got a fair shake. McPherson alleges that McDonald's engaged in pervasive racial discrimination against him and other franchisees of color.

McPherson claims that McDonald's steered him to own undesirable restaurants, refused to provide rent relief, and subjected him to onerous inspections. Meanwhile, McDonald's did the opposite for white franchisees. McDonald's steered white franchisees to own highly profitable restaurants, provided rent relief, and took a softer approach to inspections.

McPherson sued McDonald's, bringing a host of federal and state-law claims. He brings federal claims under section 1981 and section 1982, alleging racial discrimination in contracting and leasing property. He also brings two state-law claims, including breach of contract and tortious interference with business relationships.

McDonald's moved to dismiss, arguing that many of his allegations are untimely, and that the remaining allegations fail to state a claim.

For the following reasons, the motion is granted in part and denied in part.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

## I.      The Parties

People all around the world are familiar with McDonald's USA, LLC and McDonald's Corporation (collectively, "McDonald's"). The fast-food giant has 38,000 locations across the globe. *See* Cplt., at ¶ 20 (Dckt. No. 1).

Decades ago, McDonald's used to put on its signs the number of hamburgers served. McDonald's apparently stopped counting when it hit 100,000,000,000 burgers. Everything else is a rounding error. *See* Spencer Jakab, *McDonald's 300-Billionth Burger Delayed*, The Wall Street Journal (Jan. 22, 2013, at 18:26 ET), https://www.wsj.com/articles/ SB10001424127887323301104578258113829116672 ("McDonald's Corp. stopped updating the number of burgers sold back in 1994 at 99 billion.").

Its business model is largely franchise-based. *See* Cplt., at ¶ 20 (Dckt. No. 1). About 93 percent of its restaurants are operated by franchisees. *Id.* The remaining locations are operated by a wholly owned subsidiary, McDonald's Operations Co. *Id.* Roughly 69 percent of its annual revenue comes from the rent and fees that it charges to franchisees. *Id.*

Mitchell McPherson is a former McDonald's franchisee. *Id.* at ¶ 2. He owned and operated nine stores during his 35-year tenure as a franchisee. *Id.* at ¶ 66.

McPherson, who is black, contends that he was "forced out of the McDonald's system due to McDonald's systematic racial discrimination." *Id.* at ¶ 2. More specifically, McPherson believes that, because of his race, McDonald's allowed him to franchise and operate stores only in predominantly black neighborhoods. *Id.* at ¶ 4. These stores had lower sales and profits compared with stores in white neighborhoods. *Id.*

## II. The McDonald's Franchising System

Before diving into McPherson's personal experience, it is helpful to understand the corporate and franchise structure of the McDonald's hamburger empire.

The Court will start with a quick primer on the company's relationship with franchisees. In a nutshell, McDonald's, the franchisor, develops and oversees its restaurants and owns or leases the buildings. *Id.* at ¶ 21. Meanwhile, franchisees pay McDonald's fees and rent in exchange for the right to operate a specific restaurant. *Id.*

### A. McDonald's Corporate Organization

McDonald's had a multi-tiered management structure for overseeing its franchises during McPherson's tenure. *Id.* at ¶ 35. At the top, the McDonald's USA President managed overall operations for the 14,000 stores across the country. *Id.* Underneath the McDonald's USA President, Presidents of the East and West Divisions oversaw restaurants within their respective territories. *Id.*

A slew of other corporate officers worked under the division heads. In each division, a General Manager or Regional Manager supervised franchisees within a particular region and managed real estate and development strategy. *Id.*

Meanwhile, two Vice Presidents – the "VP and Regional Manager" and the "VP of Quality, Service, and Cleanliness" – were responsible for franchising decisions within a given

region. They handled setting up a franchisee with a location and deciding whether a franchisee was eligible for growth. *Id.*

Underneath the VP of Quality, Service, and Cleanliness, there were Field Service Managers or Representatives who managed and developed strategy for a subset of franchisees. *Id.* And then below the Field Service Managers, Business Consultants conducted graded visits and inspections. *Id.*

**B.      McDonald's Franchise Agreements**

McDonald's executes a standard franchise agreement with each of its franchisees. *Id.* at ¶ 23. McPherson thinks the franchise agreements are quite favorable to McDonald's. *Id.*

Franchisees have plenty of responsibilities. First, they must comply with McDonald's operating requirements, including the company's quality, service, and cleanliness standards. *Id.* at ¶ 25. Second, they must pay various fees, including rent (based on a percentage of the restaurant's gross sales), the collective advertising cost, a monthly service fee subject to gross sales, and royalties. *Id.* at ¶ 24. Third, they must pay for the cost of operations, including insurance, maintenance, and equipment. *Id.* at ¶ 25.

In exchange, McDonald's agrees to "make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants." *Id.* at ¶ 26. It also reserves the right to inspect a franchisee's restaurant at "reasonable times to ensure that [the] Franchisee's operation" complies with the company's standard and polices. *Id.* at ¶ 27.

4

### C.      Renewing, Buying, or Selling Franchises

The typical lease term for a franchise is 20 years.  McDonald's generally starts discussions with a franchisee about whether to renew or sell a lease at least three years before the term expires.  *Id.* at ¶¶ 22, 28.  McDonald's has a great deal of control over that process, because a franchisee can sell a location only with its written approval.  *Id.* at ¶ 32.  To sell, a franchisee must give McDonald's at least 20 days' notice of intent to sell.  *Id.*  A franchisee must give the name and address of the prospective buyer, and the terms and conditions of the agreement.  *Id.*

That said, under the terms of the franchise agreement, McDonald's cannot "arbitrarily withh[o]ld" its consent.  *Id.* at ¶ 33.  So, McDonald's considers a variety of factors when determining whether to provide consent for a sale.  *Id.*

McDonald's looks at the prospective buyer's "work experience and aptitude; financial background; character; ability to personally devote time and best efforts to managing the Restaurant; residence in the locality of the Restaurant; equity interest in the Restaurant; conflicting interests; and such other criteria and conditions as McDonald's shall then apply."  *Id.*

Franchisees often sell a restaurant to another franchisee.  Franchisees frequently try to expand by buying more locations.  "Expansion and ownership of multiple stores is key to a franchisee's success at McDonald's.  Owning multiple stores gives a franchisee breathing room if one store dips in sales or requires a costly renovation."  *Id.* at ¶ 30.

McDonald's does not have an "open market" for selling stores.  *Id.* at ¶ 34.  Instead, franchisees can buy stores by either receiving an offer from McDonald's or hearing about the sale opportunity through the grapevine.  *Id.*  According to McPherson, this system meant that black franchisees were limited to buying restaurants that McDonald's offered them (*i.e.*, "low-volume stores in dangerous locations") or buying from other black franchisees.  *Id.*

5

McDonald's previously applied a 40-mile standard for expansion, meaning that it encouraged franchisees not to expand beyond a 40-mile radius from their stores. *Id.* at ¶ 31. The company has relaxed that standard recently. *Id.* However, McPherson contends that McDonald's has "done so only with white franchisees." *Id.*

### III.    Historical Racial Discrimination

McPherson contends that McDonald's has "a long history of discriminating against black franchisees." *Id.* at ¶ 37. The story begins in the 1950s.

McDonald's was founded in 1955. At that point, it installed restaurants in white neighborhoods only. *Id.* at ¶ 38. It also barred black people from becoming franchisees. *Id.*

Fast forward to the late 1960s and 1970s, and McDonald's had locations in urban spaces, too. But because of "white flight" from urban areas after the assassination of Dr. Martin Luther King, Jr., McDonald's started recruiting black owner/operators to take over its more urban locations. *Id.* at ¶ 39. So, McDonald's hired its first ever black owner/operator, Herman Petty. *Id.* at ¶ 40. In 1972, Petty founded the National Black McDonald's Operators Association to advocate for black franchisees. *Id.*

Things came to a head in the early 1980s, when McDonald's started facing pushback in the courtroom, and in the court of public opinion.

By that point, according to the complaint (a disclaimer that this Court will stop making), McDonald's had a practice of "redlining." McDonald's pushed black owner/operators into agreements to operate older, low-volume restaurants in black neighborhoods that required costly renovations. *Id.* at ¶ 42. By contrast, white franchisees were rarely, if ever, placed in those stores. *Id.* at ¶ 45.

McPherson argues that this kind of racial steering was (and is) incredibly problematic for black franchisees, resulting in higher costs and lower revenues.

Locations in black neighborhoods were generally more dangerous, so McDonald's required owners to spend more money on security and maintenance. *Id.* By placing black franchisees in these stores, McDonald's effectively saddled black franchisees with higher costs. *Id.*

Locations in black neighborhoods made less revenue, too. Those locations had to lower their prices to sell to the relatively poorer customer base. *Id.* at ¶ 46. And that base was also more likely to buy the cheaper menu items, which hurt profit margins. *Id.*

In 1982, the company's practice of racial steering made its way to the courtroom. A black owner/operator, Charles Griffis, filed a discrimination lawsuit. He claimed that McDonald's had intentionally placed him in "ghetto" locations and blocked him from buying stores in suburban areas. *Id.* at ¶ 41. McDonald's settled with Griffis for $4.7 million. *Id.*

Racial steering also became an issue in the court of public opinion, as public backlash against McDonald's mounted. Jesse Jackson's civil rights organization, PUSH, protested the company's racial steering policies. *Id.* at ¶ 43. Likewise, the NAACP organized boycotts of McDonald's in Chicago and Los Angeles. *Id.*

In 1996, McDonald's Executive VP Tom Dentice conceded in a letter that McDonald's had "placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers." *Id.* at ¶ 44. That same year, McDonald's CEO Ed Rensi agreed to implement a program to establish equity between black and white McDonald's franchisees. *Id.* at ¶ 53. Specifically, McDonald's pledged to sell more profitable restaurants to black franchisees and to offer temporary rent relief. *Id.*

So, the situation looked like it was going to get better for black franchisees. But things didn't improve. McDonald's never followed through on its pledge to sell profitable restaurants to black franchisees and later disbanded the entire program in 2001. *Id.*

Instead, McDonald's continued to prevent black franchisees from buying profitable restaurants from white franchisees. *Id.* at ¶¶ 49–50. Likewise, McDonald's didn't offer rent relief to black franchisees, while continuing to grant rent relief to white franchisees. *Id.* at ¶ 48. And McDonald's tried to force black owner/operators out of the system by ramping up inspections of black franchisees – using any fault to justify "deeming them ineligible for expansion or refusing to renew their lease." *Id.* at ¶ 51.

Things allegedly went from bad to worse in 2015, when Sean Easterbrook and Chris Kempczinski took the reins as CEO and President of McDonald's USA, respectively. *Id.* at ¶ 54. (Kempczinski later became CEO in 2020.) For starters, when Easterbrook took over as CEO, he said that the number of black franchisees at McDonald's didn't matter. *Id.*

Two years later, Easterbrook and Kempczinski rolled out the "Bigger Bolder Vision 2020" program, which required expensive renovations for older stores of up to $750,000. *Id.* at ¶ 55. A consulting report from before the rollout predicted that the costs would greatly eliminate black franchisees from the McDonald's system. *Id.* McPherson alleges that Easterbrook and Kempczinski knew about the study and the disproportionate impact that the program would have on black owner/operators when they rolled out the program. *Id.*

While Easterbrook was CEO, about a third of black franchisees left the McDonald's system – a much higher percentage than non-black operators who exited. *Id.* at ¶ 57. Easterbrook also purged 43 black senior executives during his tenure, or about 85% of black employees who were at the executive-director level or above. *Id.* at ¶ 58.

Two demotions stood out. In July 2018, McDonald's demoted Vicki Guster-Hines and Domineca Neal, two black women in senior executive positions who had previously spoken out against the company's discriminatory practices. *Id.* So, Guster-Hines and Neal sued McDonald's for racial discrimination in January 2020. *Id.* McPherson says that their complaint revealed to him for the first time that McDonald's had discriminated against black franchisees. *Id.* at ¶ 59.

The numbers back up the harmful effects of discrimination against black franchisees. The annual cashflow gap between black and non-black franchisees climbed from $45,000 in 2010 to $75,380 in 2019. *Id.* at ¶ 61. Meanwhile, from 1998 to 2020, the number of black franchisees in the McDonald's system was nearly halved (from 377 to 186), even though the total number of McDonald's stores more than doubled (from 15,086 to 38,999). *Id.*

## IV.    McPherson's Experience as a Franchisee

That history provides the backdrop for the experiences of McPherson. He claims that McDonald's discriminated against him during his tenure as a franchisee.

### A.    The New York Stores

McPherson entered McDonald's registered applicant training program in 1988. *Id.* at ¶ 67. Then, in 1990, he bought his first store in a suburban, upper-middle-class neighborhood, in LaGrange, New York. *Id.* at ¶¶ 68–69. He received positive feedback while running the store. McDonald's then-CFO sent McPherson a letter saying that the LaGrange store "was the most profitable store at its sales level in the country." *Id.* at ¶ 70.

McPherson bought a second store in 1995, in the neighboring friendly sounding town of Pleasant Valley, New York. *Id.* at ¶ 71. But he had trouble staffing the store because of frequent

9

snowstorms in the area. *Id.* at ¶ 72. So, in February 2001, a McDonald's Field Consultant (Ken Green) visited the store to offer advice. *Id.*

That meeting went poorly. After Green found a few expired refrigerated products in the store, he began verbally attacking and swearing at McPherson. *Id.* at ¶ 73. McPherson told a friend about the incident, and that friend reported the incident to the McDonald's Regional Office. *Id.* at ¶ 74. Two weeks later, a McDonald's representative apologized for Green's behavior, and McDonald's assigned a black consultant to inspect McPherson's restaurants. *Id.* at ¶¶ 75–76. But Green didn't experience any repercussions from the incident. *Id.* at ¶ 76.

Later in 2001, McDonald's began offering McPherson opportunities to expand and buy more stores, in exchange for selling the New York restaurants. *Id.* at ¶ 77. McPherson agreed and worked out a deal to sell his restaurants to Carlos Wong, the only other owner/operator of color in the area. *Id.* at ¶ 78.

However, McDonald's didn't allow the deal between McPherson and Wong to go through. *Id.* at ¶ 79. Instead, it provided McPherson with a list of white franchisees to whom he could sell his stores. *Id.* So, McPherson sold the two New York stores in 2001 to a white franchisee who had received the company's preapproval. *Id.* at ¶ 80. According to McPherson, this procedure was consistent with the company's practice of reserving lucrative stores in predominantly white areas for white franchisees. *Id.* at ¶ 79.

The situation didn't go much better for McPherson when he tried to buy new stores. McPherson believes that the company intentionally offered him only substandard stores in black neighborhoods because of his race. *Id.*

10

First, McDonald's offered McPherson a set of stores in a low-income, urban part of Rochester, New York. *Id.* at ¶ 82. McPherson thought that the neighborhood seemed dangerous, and the stores were in poor condition. *Id.* So, he declined the offer. *Id.*

Second, McDonald's offered McPherson a package of five stores in Fort Pierce, Florida. *Id.* at ¶ 83. Typically, McDonald's would bring stores up to standard before selling them to a new franchisee. *Id.* But each of the stores required extensive renovations, and McDonald's refused to renovate them. *Id.* So, McPherson declined the Florida stores, too. *Id.*

Third, McDonald's offered McPherson a set of stores in Camden, New Jersey, and Philadelphia, Pennsylvania. *Id.* at ¶ 85. Each store was in poor condition, and in a dangerous, low-income area. *Id.* So, McPherson refused yet again. *Id.* That decision was lifesaving, as the franchisee who bought the stores was later shot and killed at one of his stores. *Id.*

Finally, McDonald's offered a six-restaurant package in Baltimore, Maryland. *Id.* at ¶ 86. Three of the restaurants were in very high-crime areas, and two of those restaurants were in poor condition and below the company's standards. *Id.* McPherson tried to exclude that duo of stores from the deal. *Id.* at ¶ 87. But McDonald's Ombudsman Ron Hawkins refused. *Id.* It was all-or-nothing. So, McPherson bought all six stores, including the two worst ones. *Id.*

**B.     The Baltimore Stores**

Six months after McPherson bought the Baltimore stores, McDonald's informed him that it was relocating one of the stores (the "Golden Ring location") to across the street. *Id.* at ¶ 88. The new location was much worse. *Id.* at ¶ 89. It had less access, no signage, and higher rents. *Id.*

Apparently, McDonald's knew about the relocation when McPherson purchased the stores, but did not disclose that information to him. *Id.* at ¶ 88. McPherson contacted Hawkins

11

and his local National Black McDonald's Operators Association representative to complain about the relocation. *Id.* at ¶ 90. However, McDonald's moved forward with the project, and McPherson was forced to take on the new store. *Id.*

McDonald's also constructed a new store about 150 yards from the Golden Ring location. *Id.* at ¶ 91. McPherson pitched himself to purchase the restaurant, knowing that it would eat into the Golden Ring location's sales. *Id.* at ¶ 92. But McDonald's refused, first running the store as a company-owned restaurant, before selling it to a white franchisee. *Id.* McPherson believes that McDonald's would have let him buy the restaurant but for his race. *Id.*

Then, in 2002 or 2003, McPherson reached an agreement with Jim Schaffer,[1] a white employee, to become McPherson's Director of Operations. *Id.* at ¶ 93. However, McDonald's VP Jim Norberg did not approve the contract, but soon approved Schaffer to work for a white operator instead. *Id.* McPherson believes that McDonald's did not allow Schaffer to work for him because of McPherson's race. *Id.*

Nonetheless, between 2001 and 2005, McPherson substantially improved the sales volume at his Baltimore stores. *Id.* at ¶ 95. Before the acquisition, the stores averaged about $1.6 million in annual sales. *Id.* By 2005, that number had increased to $2.3 million. *Id.*

Based on his success, McPherson sought to expand and buy more stores. So, in 2010, he negotiated a deal to buy three additional Baltimore restaurants from another franchisee for $5.3 million. *Id.* at ¶ 96. The restaurants were highly profitable and located near his stores. *Id.* McPherson was eligible for growth at the time, and he had obtained financing for the deal. *Id.*

It went nowhere. The McDonald's VP of Quality, Service, and Cleanliness (Wendell Sconiers) and the Regional Manager (Albert Seecharan) did not approve the sale. *Id.* at ¶ 97.

---

[1] The complaint refers to Schaffer both as "Schaeffer" and "Schaffer." *See* Cplt., at ¶¶ 93–94 (Dckt. No. 1). The Court goes with "Schaffer."

They did not offer a reason. *Id.* McPherson even wrote a letter to Sconiers and Seecharan asking for an explanation, but he never received a response. *Id.* Ultimately, McDonald's approved the sale of those three stores to Scott Radin, a white owner/operator. *Id.* at ¶ 98. McPherson believes that McDonald's did not approve the sale to him because of his race. *Id.* at ¶ 99.

By late 2012 or early 2013, McPherson was desperate for growth opportunities. *Id.* at ¶ 100. So, he bought a seventh store in Baltimore, on Howard Street. *Id.* He purchased the Howard Street location even though it was in a worse location, in worse condition, and in a higher-crime area than his other Baltimore stores. *Id.* at ¶ 101.

At this point in the story, the complaint does a deep dive into several negative experiences that McPherson had while owning the Baltimore stores. The Court will take those allegations chronologically, one at a time.

### *Safety Issues*

McPherson's Baltimore stores experienced serious safety issues throughout his tenure. *Id.* at ¶ 104.

In 2013, one of his employees was shot in the head outside a store, after ending a shift at midnight. *Id.* At another point, one of McPherson's employees was attacked and seriously injured in one of his restaurants. *Id.* at ¶ 106. And a customer once held one of McPherson's employees at gunpoint for "not putting enough caramel sauce on his sundae." *Id.*

The Howard Street store was particularly rough. In 2013, a man was stabbed outside the store – the man then ran into the store, collapsed, and died. *Id.* at ¶ 105. At some other point, an employee was almost stabbed after refusing to give free food to an angry customer. *Id.* at ¶ 109. Another employee at the store was brutally attacked. *Id.*

The areas around his restaurants weren't safe, either. In 2016, the police asked McPherson to close his store in the Theatre District after a stabbing across the street. *Id.* at ¶ 107. McPherson also owned a store in a shopping center. *Id.* at ¶ 108. In his time owning the store, two murders took place at the shopping plaza. *Id.*

McPherson and his family received threats, too. At least three times between 2019 and 2021, someone threatened McPherson or his family. *Id.* at ¶ 110. As far as McPherson knows, no white operator has experienced a similar threat. *Id.* at ¶ 111.

McPherson reported the safety and security incidents to McDonald's. *Id.* at ¶ 112. He also begged McDonald's to take the Howard Street store back because of his safety concerns. *Id.* at ¶ 113. However, McDonald's refused to do so. *Id.* at ¶ 114. McDonald's told him that security issues were the normal course of doing business. *Id.*

At bottom, McPherson says that he was "consistently questioned and ignored by McDonald's when he reported his safety and security concerns." *Id.* at ¶ 115.

### The Construction Incident

McPherson had construction problems, too.

In 2015, McPherson reported severe construction defects at one of his stores. *Id.* at ¶ 116. Ceramic tiles had begun falling off the walls, and one of McPherson's employees came close to suffering a serious injury. *Id.* So, McDonald's VP of Development and Construction David Nyst came to inspect the restaurant. *Id.* But instead of addressing the construction issues, Nyst verbally attacked McPherson and stuck his finger in McPherson's face. *Id.*

McPherson was rattled by Nyst's behavior. *Id.* at ¶ 118. So, he called Field Service Manager Karen Paine to report what had happened. *Id.* But no one ever apologized to

14

McPherson for Nyst's behavior. *Id.* As far as McPherson knows, Nyst was not punished. *Id.* And he believes that Nyst had never similarly yelled at white franchisees. *Id.*

### Continuing Inspections

Meanwhile, McDonald's harassed McPherson with inspections.

In 2013, McDonald's assigned Jawad Huleis, a new Field Consultant, to McPherson. *Id.* at ¶ 102. Another franchisee told McPherson that McDonald's had a practice of assigning Huleis as a Field Consultant when it wanted to force a franchisee out of the system. *Id.* at ¶ 103.

Apparently, Huleis didn't bother McPherson much for the first few years. But two things changed in 2020. First, with the launch of Bigger Bolder Vision 2020, McDonald's tightened the standards for its restaurants. The guidelines for passing graded visits became stricter. *Id.* at ¶ 121. And second, amid the COVID-19 pandemic, McDonald's announced that it was pausing inspections. *Id.*

Despite the pause in inspections, Huleis continued to inspect McPherson's restaurants, applying the new, stricter standards. *Id.* at ¶ 122. McPherson does not know any white franchisees who experienced continued inspections during the pandemic. *Id.* at ¶ 127.

McPherson complained to the National Black McDonald's Operators Association, as well as Regional Manager Harry Thomas, about the continued inspections. *Id.* at ¶¶ 123–24. Thomas told McPherson that the inspections were continuing because McPherson's restaurants had health department issues and had been closed by the health department. *Id.*

Afterwards, McPherson checked the health department website for closures in Baltimore, which provides a five-year record of restaurant closures in the city. *Id.* at ¶ 126. None of his restaurants were listed as closed. *Id.* On the other hand, Scott Radin, a white owner/operator in Baltimore, had a handful of health department closures at his stores in the past. *Id.* at ¶ 128. But

15

Huleis never inspected Radin's stores. *Id.* McPherson thinks that this "divergence demonstrates that McDonald's employed a different standard" for black and white franchisees. *Id.* at ¶ 129.

On one occasion, McDonald's sent another consultant to inspect McPherson's stores, because Huleis was on vacation. *Id.* at ¶ 130. McPherson's stores passed the other consultant's inspections with flying colors. *Id.* McPherson came to believe that Huleis was targeting his stores because McDonald's wanted to push him out of the system. *Id.* at ¶ 131.

### The Video Broadcast Incident

In February 2021, McPherson participated in a video broadcast with several McDonald's corporate employees about reconstructing one of his restaurants. *Id.* at ¶ 132. One of the employees on the broadcast, Matt Cullen, mocked McPherson's speech impediment and mimicked his studder. *Id.* at ¶ 133. McPherson felt deeply humiliated and embarrassed, and required mental and medical treatment as a result. *Id.* at ¶¶ 134, 139.

McPherson called VP of Operations, Lynn Rudy, to share how upset he was. *Id.* at ¶ 135. But Rudy, who had attended the video broadcast, did not respond. *Id.* at ¶ 136. So, McPherson sent follow-up letters to Rudy and to Regional Manager Bill Garrett. *Id.* at ¶ 137. Again, neither of them responded. *Id.* at ¶ 138. McPherson never received an apology, and Cullen was never reprimanded. *Id.* McPherson believes that Cullen mocked him because of his race. *Id.*

### Rent Relief

Throughout his tenure, McPherson requested rent relief for the Baltimore stores, given that they were low volume and making less money than other stores in the area. *Id.* at ¶ 119. McDonald's typically granted rent relief to white owner/operators, but declined McPherson's requests. *Id.*

16

*Selling the Stores*

By 2021, the ramped-up inspections and general unfairness had become too much for McPherson. He decided to cease operations. *Id.* at ¶ 140. McPherson approached McDonald's about selling his three remaining stores, which were all in low-income, high-crime areas. McDonald's directed him to non-white buyers (only). *Id.* at ¶ 143.

As a result of his experience with McDonald's, McPherson suffered chronic headaches, anxiety, and weight gain. *Id.* at ¶ 144. He thinks that he was subjected to increased inspections – and received failing scores on inspections – due to his race. *Id.* at ¶ 145. McPherson believes that he would still be in the McDonald's system if not for his race. *Id.* at ¶ 146.

## V. This Lawsuit

McPherson sued McDonald's, bringing four federal claims and two state-law claims.

His first two claims are under 42 U.S.C. § 1981 for racial discrimination in contracting. *Id.* at ¶¶ 147–57. Count I asserts that he faced targeted racial discrimination, while Count II asserts that McDonald's had a pattern or practice of racial discrimination against all black franchisees.

The next two claims are under 42 U.S.C. § 1982 for racial discrimination in the leasing of real property. *Id.* at ¶¶ 158–67. They follow the same pattern: Count III alleges targeted racial discrimination, while Count IV alleges a pattern or practice of racial discrimination.

The final two claims are under state law. Count V is a breach-of-contract claim. *Id.* at ¶¶ 168–75. And Count VI is a claim of tortious interference with business relationships. *Id.* at ¶¶ 176–80.

17

McDonald's moved to dismiss. *See* Defs.' Mtn. to Dismiss (Dckt. No. 22). McDonald's argues that most of McPherson's claims are time-barred. *Id.* at ¶¶ 5–7. McDonald's also contends that the complaint fails to state a claim for which relief can be granted. *Id.*

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**Analysis**

The complaint spans several decades, and raises six claims, so there is a lot of ground to cover. To make things easier to digest, this Court will break it into four bite-sized chunks.

For reasons that will soon become clear, this Court will start by addressing McPherson's pattern-or-practice claims (Counts II and IV). Next, the Court will consider whether the differential-treatment claims under sections 1981 and 1982 (Counts I and III) are timely. Third, the Court will turn to whether the complaint states a claim under those statutes. Fourth and finally, McPherson's state-law claims will bat cleanup.

18

Before getting into it, the Court offers a bit of a forewarning. McPherson injected some disorder and confusion into the analysis by blending and blurring concepts, and bringing overlapping claims and theories.

McPherson brings a differential treatment claim (Count I) and a pattern-or-practice claim (Count II) under section 1981. McPherson did something similar in the next two counts. McPherson brings a differential treatment claim (Count III) and a pattern-or-practice claim (Count IV) under section 1982.

McPherson ran into statute-of-limitations problems on his differential treatment claims under section 1981 (Count I) and under section 1982 (Count III). In an attempt to get around the problem, McPherson invoked the continuing violation doctrine.

But at the same time, McPherson *also* brought pattern-or-practice claims under section 1981 (Count II) and section 1982 (Count IV) about the same conduct. That's duplicative, because a pattern-or-practice claim is a type of a continuing violation.

The Seventh Circuit has classified pattern-or-practice claims as "continuing violations." *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 270 (7th Cir. 2004) ("[I]f a plaintiff alleges 'continuing violations,' which constitute a pattern and practice of discrimination, we may look outside of the relevant time period. This doctrine applies to Title VII as well as § 1981 claims.").

Several district courts have classified pattern-or-practice claims as a continuing violation. *See Medrea v. Mitutoyo Am. Corp.*, 2007 WL 9814572, at *2 (N.D. Ill. 2007) (St. Eve, J.) ("If a plaintiff alleges a continuing violation constituting a pattern and practice of discrimination, courts may look outside of the relevant time period."); *Anderson v. Advoc. Health & Hosps. Corp.*, 2014 WL 4922371, at *2 (N.D. Ill. 2014) (Kendall, J.) ("Additionally, if a plaintiff alleges

19

continuing violations, which constitute a pattern and practice of discrimination, courts may look outside of the relevant time period.") (cleaned up); *Flanagan v. Cook Cnty. Adult Prob. Dep't*, 2016 WL 1181788, at *8 (N.D. Ill. 2016), *aff'd sub nom. Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty.*, 893 F.3d 372 (7th Cir. 2018) (same); *Guzman v. N. Illinois Gas Co.*, 2009 WL 3762202, at *3 (N.D. Ill. 2009) ("Thus, the Court finds that the continuing violations doctrine can apply in pattern-or-practice cases under Title VII . . . [and] Court will apply the same rule to Guzman's § 1981 claims.").

So McPherson brings overlapping claims or theories, and is trying to double-dip. He can't bring a claim about a continuing violation under section 1981 in Count I when he simultaneously brings a claim about a pattern-or-practice under section 1981 in Count II.

The overlap creates unnecessary confusion. For now, this Court simply flags the issue for the intrepid reader. It's going to be a bumpy ride, so buckle up.

## I. Pattern-or-Practice Claims (Counts II and IV)

McPherson raises pattern-or-practice claims under section 1981 and section 1982. Pattern-or-practice claims are a means of establishing intentional discrimination. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012).

But McPherson's pattern-or-practice claims go nowhere fast. The "Seventh Circuit does not recognize a pattern and practice disparate treatment claim for individuals." *See Livingston v. City of Chicago*, 2024 WL 245214, at *6 (N.D. Ill. 2024). The "pattern-or-practice method of proof is incompatible with the method plaintiffs must use on their individual claims." *See Doe 1 v. City of Chicago*, 2020 WL 1166222, at *4 (N.D. Ill. 2020).

The Seventh Circuit has held that "evidence of a pattern-or-practice can only be collateral to evidence of specific discrimination against the plaintiff." *See Matthews v. Waukesha Cnty.*,

20

759 F.3d 821, 829 (7th Cir. 2014). *Matthews* "makes clear that in individual cases, pattern-or-practice evidence is not sufficient to establish . . . discrimination alone." *See Vargas v. Price*, 2021 WL 698500, at \*13 (N.D. Ill. 2021) (Dow, J.); *see also Watkins v. City of Chicago*, 2023 WL 155450, at \*3 (7th Cir. 2023) ("The problem with this evidence is that Watkins asserts a claim of discriminatory treatment against her as an individual – not a pattern-or-practice claim."); *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 633 (10th Cir. 2012) ("[W]e conclude individual plaintiffs . . . may not bring pattern-or-practice claims."); *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004) ("We therefore hold that the pattern-or-practice method of proving discrimination is not available to individual plaintiffs.").

In *Bacon*, the Sixth Circuit explained why an individual cannot bring a pattern-or-practice claim. Basically, a pattern-or-practice claim originated from the Supreme Court's decision in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977).

But that decision was "limited to class actions or suits by the government." *Bacon*, 370 F.3d at 575. A "pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual [discriminatory] decisions, it is inappropriate as a vehicle for proving discrimination in an individual case." *Id.*

True, a quarter century ago, the Seventh Circuit off-handedly remarked that "[i]ndividual plaintiffs do sometimes use pattern-or-practice evidence to bolster their own disparate treatment claims as evidence of pretext." *See Benjamin v. Katten Muchin & Zavis*, 10 F. App'x 346, 352 (7th Cir. 2001). But the Seventh Circuit didn't reach the issue of whether an individual can bring a pattern-or-practice claim, let alone give its blessing to that type of claim. A one-off piece of dictum doesn't mean that McPherson can bring individual pattern-or-practice claims.

McPherson brings his claim as an individual, not on behalf of a putative class. So, his pattern-or-practice claims fall by the wayside.

Even if McPherson could raise a pattern-or-practice claim, it would largely fail for another reason. McPherson must allege that discrimination "was the company's standard operating procedure – the regular rather than the unusual practice." *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977); *see also Matthews*, 759 F.3d at 829 (stating the same).

But alleging "isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case of a pattern or practice of discrimination." *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875–76 (1984); *see also Teamsters*, 431 U.S. at 336.

McPherson's allegations are both too sporadic across time and too isolated across patterns of conduct. His allegations span decades, and describe a wide-range of corporate practices, such as contracting, rent relief, inspections, and hiring.

For instance, McPherson alleges that McDonald's prevented him from selling his store to Wong, another person of color, in 2001. *See* Cplt., at ¶¶ 79–80 (Dckt. No. 1). McPherson doesn't allege similar behavior by McDonald's until 2010 – nine years later. *Id.* at ¶ 96 (describing McPherson's unsuccessful attempt to acquire three profitable stores in Baltimore).

McPherson pairs these sporadic acts with his conclusory gloss. He simply says that McDonald's maintains a "practice of reserving lucrative stores in predominantly white areas for white franchisees." *Id.* at ¶ 79. But that doesn't cut it.

McPherson's other allegations of discrimination seem isolated, at best. For example, McPherson alleges that McDonald's refused to allow him to hire Jim Schaeffer. *Id.* at ¶¶ 93–94.

22

But the company's refusal to approve of his hiring has nothing to do with McPherson's allegations about racial steering, or inspections, or rent relief.

McPherson must allege conduct that "relate[s] closely enough to constitute a continuing violation." *See Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994). But he alleges "merely discrete, isolated, and completed acts." *Id.*

Here's the bottom-line. None of the alleged practices gel together to form a cohesive pattern or practice. And McPherson cannot save his pattern-or-practice claims by "[a]lleging a common motive or conspiracy." *See Moore*, 771 F.3d at 447. His allegations that the company's policies are overarchingly racist does not convert allegations of discrete acts into an allegation of a continuing violation.

True, some of McPherson's other allegations present closer calls. For instance, McPherson's allegations about targeted inspections describe a more cohesive pattern or practice. But since McPherson cannot raise a pattern-or-practice claim, the Court will save some time, and not analyze each and every allegation.

McPherson's pattern-or-practice claims under section 1981 (Count II) and section 1982 (Count IV) are dismissed.

## II.     The Statute of Limitations for the Discrimination Claims (Counts I and III)

Most of the motion to dismiss is about the statute of limitations. That's not altogether surprising, because the complaint alleges conduct that stretches back decades.

As a preliminary note, "the statute of limitations is an affirmative defense." *United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004). Typically, "[m]oving for judgment on the pleadings under Rule 12(c) is the more appropriate way to address an affirmative defense."

23

*Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). "Dismissal under Rule 12(b)(6) [is] irregular." *N. Trust Co.*, 372 F.3d at 888.

But in the end, it may not make a lot of difference, because the standards under Rule 12(b)(6) and Rule 12(c) are the same. *See Wolf v. Riverport Ins. Co.*, 132 F.4th 515, 518 (7th Cir. 2025). They're two paths to the exits of the courthouse.

When addressing "a motion to dismiss based on [a] failure to comply with the statute of limitations," a court should grant the motion "only where 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *See Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)).

Pleadings, like people, can self-sabotage. A complaint can self-destruct, and a plaintiff can plead himself out of court. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008). "Allegations in a complaint are binding admissions, and admissions can of course admit the admitter to the exit from the federal courthouse. We have expressed our puzzlement that lawyers insist on risking dismissal by filing prolix complaints." *Jackson v. Marion County*, 66 F.3d 151, 154 (7th Cir. 1995). "If plaintiffs' lawyers want to live dangerously – or want to find out sooner rather than later whether they have a claim – they can." *Id.*

It isn't easy for a pleading to plant the seeds of its own destruction. But it happens. A plaintiff "must affirmatively plead himself out of court; the complaint must 'plainly reveal [] that [the] action is untimely under the governing statute of limitations.'" *Id.* at 614 (alterations in original) (quoting *Lewis*, 411 F.3d at 842).

24

McDonald's argues that the complaint contains lots of allegations about old conduct. As the company sees things, large chunks of the racial discrimination claims under sections 1981 and 1982 are time barred. The Court will address each claim separately.

Overall, McDonald's is directionally correct when it comes to the statute of limitations. The complaint is chock-full of untimely allegations. Many of the events took place decades ago, long before the clock ran out on the claims.

When it comes to the timeliness of the allegations, the complaint contains more fat than meat. It's mostly filler.

### A. Section 1981 (Count I)

McPherson raises a differential-treatment claim under section 1981. The Court starts with a brief roadmap. McPherson's claim came with wrinkles, but the Court will iron them out.

Some of the section 1981 allegations are governed by a two-year statute of limitations, and some of the section 1981 allegations are governed by a four-year statute of limitations. That's complicated enough.

But then, McPherson tried to shoe-horn untimely allegations into Count I. He describes Count I as a "continuing violation," even though he separately brought a pattern-or-practice claim under section 1981 in Count II. McPherson also argued that equitable tolling applies to his untimely allegations.

So, this Court needs to do some sorting. This Court needs to divide the allegations and pin down what is governed by a two-year period, and what is governed by a four-year period. Then, the Court must address McPherson's continuing violation and equitable tolling arguments. So, this Court needs two buckets, or maybe two mop buckets with internal dividers.

With that path in mind, the Court dives in, and starts from the top.

25

Section 1981 "provides a cause of action for discrimination on the basis of race in making and enforcing contracts." *Byrd v. McDonald's USA, LLC*, 2021 WL 2329369, at *3 (N.D. Ill. 2021); *see also* 42 U.S.C. § 1981. But section 1981 does not include a statute of limitations.

When federal law lacks a statute of limitations, there are two possibilities for filling the void. It depends on when Congress enacted the statute in question.

For statutes enacted by December 1, 1990, "courts apply the most closely analogous statute of limitations under state law." *Reed v. United Transp. Union*, 488 U.S. 319, 323 (1989). But for civil actions arising under any federal law enacted after December 1, 1990, courts apply a four-year statute of limitations. *See* 28 U.S.C. § 1658 ("Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [*i.e.*, December 1, 1990] may not be commenced later than 4 years after the cause of action accrues.").

Section 1981 sits on both sides of the fence. Congress enacted section 1981 *before* 1990, but amended the statute *after* 1990. The statute falls on both sides of the statute-of-limitations line.

The applicable statute of limitations for a claim under section 1981 depends on the content of the claim. The time period depends on whether the claim was cognizable before 1990. *See Yates v. H&M Int'l Transp., Inc.*, 2019 WL 2994527, at *3 (N.D. Ill. 2019) (Dow, J.).

If the claim was cognizable before the amendment in 1990, then courts borrow the most closely analogous statute of limitations under state law. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). On the other hand, if the claim was not cognizable until the

26

amendment in 1990, then courts apply a four-year statute of limitations under the catch-all provision in section 1658. *Id.*

Congress enacted section 1981 in 1866. Putting that date in perspective, section 1981 came only one year after the assassination of President Lincoln and the end of the Civil War, and two years before the ratification of the Fourteenth Amendment. *See* Civil Rights Act of 1866, § 1, 14 Stat. 27 (codified as amended at 42 U.S.C. § 1981). There aren't a lot of older federal statutes that give rise to a cause of action.

Section 1981 originally prohibited racial discrimination, but in a limited sphere. It protected the right to "make and enforce contracts." *Id.* Section 1981 covers the making and breaking of contracts.

So, the original statute covered conduct that occurred before contract formation, and later efforts to enforce the contract. But it did not apply to any "post-formation conduct unrelated to that contract's enforcement." *See Yates*, 2019 WL 2994527, at *3 (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989)).

The text of section 1981 simplifies the process when it comes to the statute of limitations. Any claim about the formation of a contract, or about the enforcement of a contract, is subject to the statute of limitations from the most closely analogous claim under state law. For section 1981, the most analogous claim is a personal-injury claim. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661–62 (1987).

In Illinois, the statute of limitations for personal-injury claims is two years. *See* 735 ILCS 5/13-202; *Smith v. Chicago Heights*, 951 F.2d 834, 839 (7th Cir. 1992). So, any claims by McPherson about forming or enforcing a contract are subject to a two-year statute of limitations.

27

Over a century later, in 1991, Congress amended section 1981. *See* Civil Rights Act of 1991, Pub. L. 102-166 (codified as amended at 42 U.S.C. § 1981). The amended statute expanded the original phrase "make and enforce contracts" to "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.*; *see also* 42 U.S.C. § 1981(b). In other words, section 1981 now applies to post-formation conduct, too, above and beyond the enforcement of a contract.

In light of the amendment, a four-year statute of limitations under section 1658 (*i.e.*, the default rule for statutes after 1990) applies to any section 1981 claims about conduct after contract formation, unless the conduct involves the enforcement of a contract. *See Dandy*, 388 F.3d at 269 & n.4. So, McPherson's post-formation contract claims are subject to a four-year statute of limitations.

With the relevant statute of limitations in hand, the Court now turns to consider whether McPherson has "plead[ed] too much and admit[ted] definitely that the applicable limitations period has expired." *See Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004).

To determine which statute of limitations applies to which allegations, the Court needs to sort the alleged conduct into two buckets. One bucket contains pre-contractual-formation conduct, and the other bucket contains post-contractual-formation conduct.

### 1. Pre-Contract-Formation Conduct

The Court will start with the claim about pre-contract-formation conduct. Pre-contract-formation conduct is what it sounds like – it is what McDonald's did before entering into the

franchise agreements with McPherson.[2]  Pre-formation conduct often describes ways that a defendant discriminatorily entered into (or declined) certain contracts.  For example, a discriminatory-hiring claim is a paradigmatic pre-contract-formation claim.  *See Yates*, 2019 WL 2994527, at *4.

Here, some of the complaint alleges pre-contract-formation conduct.  McPherson alleges that McDonald's engaged in racial-steering by refusing to approve contracts for him to buy lucrative locations (and, conversely, offered him contracts to buy less desirable stores).

That's pre-contract-formation conduct.  *See Byrd*, 2021 WL 2329369, at *5.  The whole point is that McDonald's didn't allow McPherson to form certain contracts based on his race.

So, to the extent that McPherson bases his claim on the company's attempts to steer him to *purchase* economically undesirable locations in low-income areas, his claims are subject to a two-year statute of limitations.  McPherson filed his complaint on May 9, 2023.  So anything before May 9, 2021 is time barred.

That's a problem for McPherson.  The complaint alleges that McDonald's engaged in racial steering when McPherson bought franchises.  The purchases took place decades ago, so McPherson is decades too late.

The complaint alleges that, in 2001, McDonald's steered him toward buying packages of stores that predominantly or completely consisted of stores in low-income, black neighborhoods, including the package of Baltimore stores he ultimately bought.  *See* Cplt., at ¶¶ 82–87 (Dckt. No. 1).  And he alleged that, in 2010, he negotiated a deal to buy three lucrative restaurants in Baltimore, but McDonald's blocked the deal (and later approved the sale of the restaurants to a white operator).  *Id.* at ¶¶ 96–98.

---

[2]  The Court assumes that McPherson and McDonald's created a separate franchise contract for each location.  *See, e.g.*, Cplt., at ¶ 24 (describing fees based on a percentage of "the location's" gross sales).

The clock ran out on any claim about contract formation decades ago. Even so, McPherson gives two reasons why, in his view, the claim can survive. The first is the continuing violation doctrine, and the second is equitable tolling.

This Court will take them up, one at a time.

### a.[3]  The Continuing Violation Doctrine

McPherson argues that the clock did not start ticking because the conduct involved a continuing violation.

The "continuing violation doctrine . . . does not apply to a 'a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing.'" *Kovacs v. United States*, 614 F.3d 666, 676 (7th Cir. 2010) (quoting *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 443 (7th Cir. 2005)); *see also Moore v. Burge*, 771 F.3d 444, 447 (7th Cir. 2014) ("Each discrete act—something wrongful independent of other events—carries its own period of limitations.").

McPherson's differential-treatment claim under section 1981 is time-barred to the extent that it relies on allegations of discrete acts that occurred outside the statutory limitations period. A "plaintiff seeking redress for a series of discrete discriminatory acts cannot avoid the effect of the limitations period by arguing that the discrete acts are 'plausibly or sufficiently related.'" *See Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

---

[3] Not everyone loves sub-sub-subheadings, this writer included. But at some point, even the most dedicated reader needs some help and some TLC. Otherwise, a reader could get lost in the morass, and feel an irresistible temptation to run for the hills. You'll get by with a little help from your sub-sub-subheadings.

McPherson must allege "[d]eeds that are not themselves violations of law" but "become actionable [when] they add up." *See Turley v. Rednour*, 729 F.3d 645, 654 (7th Cir. 2013) (Easterbrook, J., concurring).

A discrete act may cause continuing harm, but the Supreme Court has held "that a continuation of injury does not extend the period of limitations. Likewise a new discrete violation does not extend the time to sue about an old discrete violation, even if the new violation occurs while the injury from the old discrete violation continues." *Id.* (internal citation omitted).

As the Seventh Circuit has noted, the continuing violation isn't really "about a continuing, but about a *cumulative*, violation." *See Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008) (emphasis added).

A prime example of a "cumulative" violation is workplace harassment. "The first instance of a coworker's offensive words or actions may be too trivial to count as actionable harassment, but if they continue they may eventually reach that level and then the entire series is actionable." *Id.*

A cumulative violation only arises "when it is not immediately apparent that the law is being violated." *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). Some discrete acts "are easy to identify," like "termination, failure to promote, denial of transfer, or refusal to hire." *See Morgan*, 536 U.S. at 114. Other discrete acts might be less obvious. *See, e.g., Deibel v. Hoeg*, 998 F.3d 768, 771 (7th Cir. 2021) (holding that a "freezeout" of a minority investor constituted a discrete act).

In *Morgan*, the Supreme Court held that discrete discriminatory acts occurring outside the statute of limitations period are not actionable. *See Morgan*, 536 U.S. at 113–14. But the

31

Supreme Court applied a different rule for hostile work environment claims since those claims involve a continuing violation.

It is helpful to compare a hostile work environment with McPherson's allegations. A hostile work environment "occurs over a series of days or perhaps years." *Id.* at 115. But in "direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 115.

Here, McPherson's allegations span years. But the company's conduct constituted discrete acts, and each act was actionable on its own.

The complaint alleges that, in 2001, McDonald's steered McPherson toward buying packages of stores that predominantly or completely consisted of stores in low-income, black neighborhoods, including the package of Baltimore stores he that ultimately bought. *See* Cplt., at ¶¶ 82–87 (Dckt. No. 1).

And McPherson alleged that, in 2010, he negotiated a deal to buy three lucrative restaurants in Baltimore, but McDonald's blocked the deal (and later approved the sale of the restaurants to a white operator). *Id.* at ¶¶ 96–98.

A franchisor's refusal to approve a contract with a franchisee because they're black is like an employer's refusal to hire an employee because they're black. Each instance is "easy to identify," like a "termination, failure to promote, denial of transfer, or refusal to hire." *See Morgan*, 536 U.S. at 114.

If McDonald's racially steered McPherson away from certain stores in 2001 or 2010, then those instances were independently actionable. McPherson did not need to be racially steered away from opportunities multiple times to state a claim for relief.

32

Now, that's not to say that the old conduct is out the case. The old conduct might provide "background evidence in support of a timely claim."[4] *Id.* at 113. But time-barred discrete acts cannot, on their own, state a claim to relief.

### b. Equitable Tolling

McPherson also invokes the doctrine of equitable tolling. He contends that any limitations period was equitably tolled because "despite all due diligence," McPherson was "unable to obtain vital information bearing on the existence of his claim." *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990).

"Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." *See Wallace v. Kato*, 549 U.S. 384, 396 (2007). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

Equitable tolling is an "extraordinary remedy that is rarely granted." *See Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016) (cleaned up); *see also Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013) (quoting *Simms v. Acevedo*, 595 F.3d 774, 781 (7th Cir. 2010)).

McPherson doesn't "allege any facts to justify the doctrine of equitable tolling, [so] it does not apply here." *See Coleman v. Gaetz*, 2010 WL 3802360, at *5 (N.D. Ill. 2010); *see also Zalesiak v. UnumProvident Corp.*, 2007 WL 4365345, at *7 (N.D. Ill. 2007) ("When invoking the doctrine of equitable tolling, a plaintiff must plead specific facts to support the court's conclusions that she exercised due diligence and that the statute of limitations must be tolled.");

---

[4] Needless to say, this Court is not issuing any rulings on the admissibility of any evidence at the motion-to-dismiss stage. The admissibility of the backstory is not guaranteed, given the length of the story. Telling this elongated story in its entirety might overwhelm the jury.

*Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (per curiam) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.").

To sum it up so far, the statute of limitations bars any claim of differential treatment under section 1981 to the extent that it rests on discrete pre-contract-formation conduct.

### 2. Post-Contract-Formation Conduct

The remainder of McPherson's allegations under section 1981 describe post-contract-formation conduct. The alleged post-contract-formation conduct is much broader than the alleged pre-contract-formation conduct.

The Court will go allegation by allegation to apply the four-year statute of limitations. Here, the statute-of-limitations period is four years, running from May 9, 2019 to May 9, 2023 (*i.e.*, the day of the filing of the complaint).

One of the allegations involved racial steering. McPherson alleged that McDonald's racially steered him to sell his desirable locations to white owners, while steering him to sell his non-desirable locations to black owners. That's post-contract-formation conduct because it relates to how McDonald's racially discriminated against him in the modification and termination of the franchise agreements.

McPherson brings two such allegations.

First, he alleges that, in 2001, he tried to sell his lucrative New York stores to Carlos Wong, the only other owner/operator of color in the area. *See* Cplt., at ¶¶ 68–69, 71, 77–78 (Dckt. No. 1). But McDonald's blocked that sale, and allowed him to sell his business only to white owner/operators. *Id.* at ¶¶ 79–80.

34

Second, McPherson alleges that, in 2021, McDonald's directed him to sell to buyers who were black or people of color when he tried to sell his Baltimore stores in low-income, high-crime areas. *Id.* at ¶ 143.

Applying the four-year statute of limitations, the 2001 incident is time-barred and no longer actionable, but the 2021 incident remains actionable.

McPherson also made other allegations of racial discrimination, above and beyond racial steering.[5] McPherson alleges that, in 2002 or 2003, McDonald's blocked his contract to hire Schaffer, a white man, but soon approved Schaffer to work for a white operator. *Id.* at ¶¶ 93–94. That's far outside the statutory limitations period and thus time-barred.

McPherson next alleges that he "requested rent relief" for his Baltimore stores "throughout his tenure," since they were low volume and making less money than other, more profitable stores in the same area. *Id.* at ¶ 119. But McDonald's consistently denied his requests, even though McDonald's granted similar rent relief to white owner/operators. *Id.* at ¶ 120.

To the extent that any rent relief requests were made before May 9, 2019, they are time-barred, but any requests made after May 9, 2019 remain actionable.[6]

Next, McPherson alleges that Field Consultant Huleis engaged in racially discriminatory inspections during the COVID-19 pandemic in 2020 and 2021. *Id.* at ¶¶ 121–22. Those

---

[5] The Court will not address McPherson's allegation that a McDonald's corporate employee (Cullen) mocked McPherson's speech impediment because of his race. *See* Cplt., at ¶¶ 132–33, 138 (Dckt. No. 1). As this Court will discuss in more detail below, that allegation falls by the wayside for failure to state a claim. *See infra*. First, it contains "no factual allegations directly or indirectly connecting the [incident] with [his] race." *See Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022). And even if it did, the Court doesn't see how that mocking rose to the level of a "loss of a legally protected right." *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

[6] True, McPherson doesn't identify when exactly he made his requests for rent relief. *See* Cplt., at ¶¶ 86, 140–43 (Dckt. No. 1). But he doesn't have to, because "complaints need not anticipate and attempt to plead around defenses." *See United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004).

allegations comfortably fall within the four-year statutory limitations period and remain independently actionable.

### a.     The Continuing Violation Doctrine

McPherson again invokes the continuing violation doctrine.  But again, the doctrine does not apply.  The Court quickly marches through the three untimely allegations that McPherson hopes to rescue.

First, McPherson alleges that McDonald's blocked a sale to Wong in 2001.  *See* Cplt., at ¶¶ 68–69, 71, 77–80 (Dckt. No. 1).

Second, McPherson alleges that, in 2002 or 2003, McDonald's blocked his contract to hire Schaffer, a white man.  *Id.* at ¶¶ 93–94.

Third, McPherson alleges that he made requests for rent relief "throughout his tenure." *Id.* at ¶ 119.  Without more precision, the Court assumes McPherson made some requests before 2019.

Again, the "continuing violation doctrine . . . does not apply to a 'a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing.'"  *See Kovacs*, 614 F.3d at 676 (quoting *Rodrigue*, 406 F.3d at 443); *see also Moore*, 771 F.3d at 447 ("Each discrete act—something wrongful independent of other events— carries its own period of limitations.").

McPherson fails to allege a continuing violation for a few reasons.  To establish a continuing violation, the company's actions must be "related closely enough to constitute a continuing violation" and not "merely discrete, isolated, and completed acts which must be regarded as individual violations."  *See Doe*, 42 F.3d at 446.

After all, the Seventh Circuit has said the doctrine is misnamed because it is "not about a continuing, but [rather] about a *cumulative*, violation." *See Limestone*, 520 F.3d at 801 (emphasis added). The doctrine allows a "suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." *Id.*

Here, McPherson alleges three very different courses of action: (1) McDonald's blocked the sale of a store; (2) McDonald's blocked the hiring of an employee; and (3) McDonald's denied rent relief. Those allegations lack cohesion and are not closely related. *See Doe*, 42 F.3d at 446.

Plus, these allegations could have given rise to liability independently, not cumulatively. McPherson does not allege "[d]eeds that are not themselves violations of law" but only "become actionable if they add up." *See Turley*, 729 F.3d at 654 (Easterbrook, J., concurring).

If McDonald's denied McPherson the sale of a store, the ability to hire an employee, or the benefit of rent relief due to his race, then McPherson had a claim for each allegation at the time it happened. He didn't need to wait for these bad events to accumulate or blossom into a cognizable claim – he already had the ability claims.

Again, old conduct *might* provide "background evidence in support of a timely claim." *See Morgan*, 536 U.S. at 113. But time-barred discrete acts cannot, on their own, state a claim to relief.

### b.    Equitable Tolling

McPherson also invokes the doctrine of equitable tolling. For the same reasons as above, this Court will not apply equitable tolling to McPherson's claims. McPherson doesn't "allege any facts to justify the doctrine of equitable tolling, [so] it does not apply here." *See Coleman*, 2010 WL 3802360, at *5.

37

*     *     *

To recap, McPherson's differential-treatment claim under section 1981 is time-barred to the extent that it relies on allegations of discrete acts that occurred outside the statutory limitations period. The time-barred allegations include: (1) buying stores in 2001 and 2010; (2) selling his stores in 2001; and (3) not being allowed to hire Schaffer in 2002 or 2003.

But some of the differential-treatment claim under section 1981 is timely. The claim survives to the extent that it covers (1) the sale of his stores in 2021; (2) the denial of his requests for rent relief after May 9, 2019; and (3) racially discriminatory inspections in 2020 and 2021.

## B.     Section 1982 (Count III)

Count III falls under a different statute, section 1982.

Section 1982 provides that everyone has the same right to "inherit, purchase, lease, sell, hold, and convey real and personal property." *See* 42 U.S.C. § 1982. Like section 1981, section 1982 contains no statute of limitations.

Again, for statutes enacted on or before December 1, 1990, "courts apply the most closely analogous statute of limitations under state law." *See Reed*, 488 U.S. at 323. Section 1982 was enacted at the same time as section 1981 (in 1866). But unlike section 1981, section 1982 has never been amended. *See* Civil Rights Act of 1866, § 1, 14 Stat. 27 (codified as amended at 42 U.S.C. § 1982).

So, section 1982 borrows the two-year statute of limitations under state law for personal-injury claims. *See Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1528 (7th Cir. 1990) (Posner, J.). A four-year statute of limitations doesn't apply because Congress didn't amend section 1982 after 1990. Therefore, McPherson's section 1982 claims must rest on conduct that occurred after May 9, 2021, meaning two years before filing the complaint.

38

McPherson makes the same allegations in his claims under section 1981 and section 1982. So the same analysis and the same conclusions apply. McPherson's claim under section 1982 is time barred to the extent that he relies on allegations of discrete acts that occurred outside the statutory limitations period, meaning before May 9, 2021.

For the same reasons as discussed above, the time-barred allegations include McPherson's allegations about (1) buying stores in 2001 and 2010; (2) selling his stores in 2001; and (3) not being allowed to hire Schaffer in 2002 or 2003. McPherson "pleaded himself out of court." *See Chicago Bldg. Design*, 770 F.3d at 614.

However, his allegations remain timely to the extent that they involve (1) selling his stores after May 9, 2021; (2) getting denied rent relief after May 9, 2021; (3) getting subjected to discriminatory inspections from May 9, 2021.[7]

Any arguments about continuing violations or equitable estoppel fail for the reasons discussed above.

## II.     The Failure to State a Discrimination Claim (Counts I and III)

Next, the Court will turn to whether the complaint states a claim. The Court will put the time-barred allegations to one side, and will address what's left.

Again, section 1981 "provides a cause of action for discrimination on the basis of race in making and enforcing contracts." *See Byrd*, 2021 WL 2329369, at *3. The statute explains that

---

[7] The statute of limitations for all section 1982 claims is only two years, compared to the four-year statute of limitations for post-contract-formation conduct under section 1981. So, the shorter limitations period starts on May 9, 2021, rather than May 9, 2019, and may eventually cut off any facts from before May 9, 2021 about McPherson being racially steered in selling his stores in 2021. In the same vein, the statute of limitations may also cut off facts about rent relief and continued inspections, which necessarily ended when McPherson sold his final stores. In any event, it doesn't matter at the pleading stage, because "complaints need not anticipate and attempt to plead around defenses." *See United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004). These allegations may later turn out to be time-barred, but McPherson hasn't "affirmatively plead[ed] himself out of court" at the motion-to-dismiss stage. *See Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014) (Sykes, J.).

"make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *See* 42 U.S.C. § 1981(b).

Meanwhile, section 1982 protects everyone's equal right to "inherit, purchase, lease, sell, hold, and convey real and personal property." *See* 42 U.S.C. § 1982.

"Because sections 1981 and 1982 are derived from the first section of the Civil Rights Act of 1866 and share a common purpose, federal courts construe [s]ection 1981 and 1982 claims in tandem." *See Parvati Corp. v. City of Oak Forest*, 2012 WL 957479, at *7 (N.D. Ill. 2012) (St. Eve, J.); *see also Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996); *Runyon v. McCrary*, 427 U.S. 160, 171 (1976).

McPherson brings claims under both statutes, alleging that McDonald's intentionally discriminated against him. To state an intentional-discrimination claim under section 1981 or section 1982, a plaintiff must allege that the defendant intentionally discriminated against him on the basis of race concerning contracting or property, respectively, and that there was but-for causation connecting the plaintiff's race to the alleged discrimination.[8] *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

---

[8] The Seventh Circuit has required plaintiffs to plead membership in a racial minority. *See, e.g.*, *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006). And district courts in this district, including this Court, have dutifully recited that element since. *See, e.g.*, *Galbreath v. Help at Home, LLC*, 2025 WL 919574, at *4 (N.D. Ill. 2025); *Piccioli v. Plumbers Welfare Fund Local 130, U.A.*, 2020 WL 6063065, at *5 (N.D. Ill. 2020); *James v. Get Fresh Produce, Inc.*, 2018 WL 6199003, at *7 (N.D. Ill. 2018). But this Court recently expressed doubt as to "whether the first element – being a member of a 'racial minority' – is long for this world." *See Galbreath*, 2025 WL 919574, at *4. In that decision, this Court pointed to the Supreme Court's earlier statement that section 1981 "is applicable to racial discrimination in private employment against white persons." *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976) (Marshall, J.). This Court also noted that the Seventh Circuit does not apply that element to *retaliation* claims under section 1981. *See Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016); *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). Since this Court's decision in *Galbreath*, the Supreme Court has now held that "Title VII does not impose . . . a heightened standard on majority-group plaintiffs" at the first step of *McDonnell Douglas* burden shifting. *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 313 (2025).

McDonald's sees two problems. First, McDonald's argues that McPherson's non-time-barred allegations do not adequately plead discriminatory intent. *See* Defs.' Mem. in Supp. of Mtn. to Dismiss, at 14–17 (Dckt. No. 23). And second, McDonald's contends that McPherson has not adequately alleged "but for" causation. *Id.* at 17–18.

This Court disagrees on both points.

First, McPherson has adequately alleged discriminatory intent. Pleading intent is not a high bar. The Seventh Circuit has held that a plaintiff can plead intent to discriminate generally at the motion-to-dismiss stage.[9] *See, e.g.*, *Freeman v. Metro. Water Reclamation Dist.*, 927 F.3d 961, 965 (7th Cir. 2019) ("[The plaintiff] needed only to allege – as he did here – that [his employer] fired him because of his race."); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) ("[A] complaint alleging sex [or race] discrimination need only aver that the employer instituted a (specified) adverse . . . action against the plaintiff on the basis of her sex [or race].").

Of course, a plaintiff must allege some factual content, and cannot offer conclusions, labels, and catch-phrases. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Parroting the elements of a claim isn't enough. The degree of factual detail is "not easily quantified, but 'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together.'" *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

---

That's all the more reason to not require a plaintiff to plead membership in a racial minority for a section 1981 claim. In any event, McPherson has pleaded membership in a racial minority here by alleging that he is black. *See* Cplt., at ¶ 148 (Dckt. No. 1).

[9] The Seventh Circuit has recognized that the various federal antidiscrimination statutes apply the same standards to intentional-discrimination claims. *See, e.g.*, *Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020) (recognizing that the same standards govern intentional-discrimination claims under Title VII, section 1981, and section 1983).

At a minimum, a complaint must identify: "(1) who discriminated against [the plaintiff]; (2) the type of discrimination that occurred; and (3) when the discrimination took place." *Id.* at 617. But "[t]he required level of specificity rises with the complexity of the claim." *Id.* at 616. At bottom, the key question is whether a plaintiff has "advance[d] plausible allegations that []he experienced discrimination because of [his] protected characteristics." *See Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022).

McPherson's individual claims are relatively simple. He alleges that McDonald's racially discriminated against him during his career as a McDonald's franchisee. The level of specificity required to state a claim is relatively low, and McPherson clears that hurdle.

Overall, the complaint tells a cohesive story. It is full of specifics, and includes enough details to overcome the plausibility standard. The narrative holds together, and a reader can follow the thread. It satisfies the purpose of notice pleading.

But there are exceptions. Not every allegation can support a claim.

McPherson alleged that he participated in a video broadcast where a McDonald's corporate employee, Matt Cullen, mocked McPherson's speech impediment and mimicked his stutter. *See* Cplt., at ¶¶ 132–33 (Dckt. No. 1). McPherson also alleges that it would not have happened "[w]ere it not for his race." *Id.* at ¶ 138. Those allegations have two problems.

First, McPherson doesn't "advance plausible allegations that []he experienced discrimination *because of* [his] protected characteristics." *See Kaminski*, 23 F.4th at 776 (emphasis added); *see also Comcast*, 589 U.S. at 341 (requiring but-for causation). He needed to provide "more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action." *See Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016).

McPherson offers a bottom-line conclusion, alleging that Cullen mocked him because of his race. But he doesn't offer any facts that could give rise to a plausible inference that the mockery had something to do with his race. So, McPherson "includes no factual allegations directly or indirectly connecting" Cullen's mocking with his race. *See Kaminski*, 23 F.4th at 776.

Second, even if Cullen mocked McPherson because of his race, that mocking doesn't rise to the level of a "loss of a legally protected right." *See Comcast*, 589 U.S. at 341. Recall that section 1981 and section 1982 prohibit racial discrimination when it comes to contracting or real property. Making fun of someone for their manner of speech is rude and wrong. But McPherson doesn't explain how the rude conduct impaired his contractual or property rights.

In contrast, McPherson's other allegations from within the statutory limitation period sufficiently paint a plausible picture of racial discrimination.

For example, consider McPherson's allegations about racially discriminatory inspections during the COVID-19 pandemic. As a recap, the complaint includes allegations about two franchisees in the Baltimore area – himself, a black franchisee, and Radin, a white franchisee. *See* Cplt., at ¶¶ 96, 98, 121–28 (Dckt. No. 1). McDonald's had paused inspections around the country during the COVID-19 pandemic. *Id.* at ¶ 121. But Field Consultant Huleis kept inspecting McPherson's restaurants, even though his restaurants had not faced health department closures in the previous five years. *Id.* at ¶¶ 122, 126. Meanwhile, Huleis did not inspect Radin's stores, even though Radin's stores had five or six health department closures in the past. *Id.* at ¶ 128.

Huleis's differential treatment of McPherson and Radin paints a plausible picture of racial discrimination. It explains how McDonald's discriminated against him by holding black

43

and white franchisees to different standards during the COVID-19 pandemic. Inspecting the restaurants of a black franchisee (with no health department closures) while not inspecting the restaurants of a white franchisee in the same area (with multiple past health department closures) is a plausible story of racial discrimination. The complaint offers enough details to give notice to McDonald's.

Those allegations also do enough to suggest that McPherson lost a legally protected right. McDonald's has a contractual right to inspect a franchisee's restaurants. *Id.* at ¶ 27. Even so, McDonald's can't enforce that right in a racially discriminatory way. Doing so plausibly infringes on McPherson's rights under section 1981 and section 1982.

Another allegation involved McPherson's attempt to sell his final stores in 2021, which were all in low-income, high-crime areas. McDonald's directed him only to buyers who were black or people of color. *Id.* at ¶ 143. That allegation again paints a picture of racial discrimination. It's racial steering.

That allegation finds support in allegations of earlier incidents of racial-steering. Those instances are not independently actionable (and cannot state a claim to relief on their own) because they are time-barred. Still, those allegations provide "background evidence" for McPherson's actionable allegations. *See Morgan*, 536 U.S. at 113.

Here, the (time-barred) background evidence includes allegations that (1) McDonald's barred McPherson from selling his lucrative, first two stores to Carlos Wong, the only other owner/operator of color in McPherson's area, *see* Cplt., at ¶¶ 78–79 (Dckt. No. 1); (2) McDonald's allowed McPherson to sell those same two stores to any white operator in the area (and even some white operators outside the area), *id.* at ¶¶ 79–80; and (3) after McPherson sold his stores, McDonald's offered him only packages of stores consisting predominantly or

completely of stores in low-income, black neighborhoods, *id.* at ¶¶ 82–87.[10] Those allegations of earlier racial steering provide background for the allegation that McDonald's racially steered McPherson in the sale of his final stores in 2021.

So, McPherson adequately alleges that McDonald's racially discriminated against him in 2021 by allowing him to sell his low-performing and less desirable stores only to black franchisees or franchisees of color. Those allegations adequately allege violations of McPherson's right to freely terminate and make contracts under section 1981 and his right to sell real property under section 1982 without regard to his race. *See* 42 U.S.C. §§ 1981, 1982.

The other allegation involves rent relief. McPherson alleges that McDonald's consistently denied his requests for rent relief for his low-performing stores, while granting similar rent relief to white owner/operators. *See* Cplt., at ¶¶ 119–20 (Dckt. No. 1).

Those allegations are more vague. But "a complaint in federal court pleads claims, not facts," and "fact pleading to show a prime facie case is not needed in an employment-discrimination case." *See Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021). Instead, "a plaintiff need only allege enough facts to allow for a *plausible* inference that the adverse action suffered was connected to her protected characteristics." *See Kaminski*, 23 F.4th at 777 (emphasis in original).

And McPherson's rent-relief allegations do go beyond "generalized allegations alone." *See Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 855 (7th Cir. 2019). McPherson doesn't

---

[10] That's not to mention the other non-steering allegations of racial discrimination that fall outside the statutory limitations period. Because the allegations of racial steering are more than enough to make his claim plausible, this Court will not make a long opinion longer by rehashing every single one of McPherson's allegations of racial discrimination. *See, e.g.*, Cplt., at ¶¶ 93–94, 96–99 (Dckt. No. 1). Suffice it to say, those allegations similarly help to paint a background that makes McPherson's claims based on actionable conduct more plausible.

baldly assert that McDonald's denied him rent relief because of his race. Instead, he explains why he thinks that's the case – he knew white franchisees got rent relief when he got none.

As the Court sees things, McPherson has done enough at this stage to state a claim for racial discrimination in the denial of rent relief.

Here's the bottom line. McPherson's individual differential-treatment claims under section 1981 and section 1982 survive to the extent that they are based on allegations of (1) racial steering in selling his stores in 2021, (2) the denial of requests for rent relief from May 9, 2019 onward, and (3) targeted and onerous inspections from May 9, 2019, onward.

## III. The Breach-of-Contract Claim (Count V)

The next climb on the motion-to-dismiss journey involves the two state-law claims. One claim is a breach-of-contract claim, and the other claim is a tortious interference claim.

The Court will start with the breach-of-contract claim. At this stage, a district court can consider the contract without converting the motion to dismiss into a motion for summary judgment. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002); *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

McPherson didn't attach the contract to the complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). But both parties included a copy of a Franchise Agreement, and a Franchise Disclosure Document, to their filings. *See* Defs.' Ex. 1, at 76 (Dckt. No. 23-1); Pl.'s Ex. B, at 3 (Dckt. No. 28-2); Defs.' Ex. 1, at 2; Pl.'s Ex. A, at 3 (Dckt. No. 28-1). They attached generic samples, not the documents that McPherson actually signed. But apparently there is no difference, so the Court will consider them by agreement.

46

### A.      The Statute of Limitations

The first issue is the statute of limitations.  Illinois has a 10-year statute of limitations for a breach-of-contract claim, running from the breach.  *See* 735 ILCS 5/13-206; *see also West Am. Ins. Co. v. Sal E. Lobianco & Son Co., Inc.*, 370 N.E.2d 804, 807 (Ill. 1977).

McPherson filed suit on May 9, 2023.  So, the breach-of-contract claim is time barred to the extent that any alleged breach took place before May 9, 2013.

### B.      The Failure to State a Claim

McDonald's argues that McPherson's timely allegations fail to state a claim for relief, meaning any alleged breach after May 9, 2013.  Under Illinois law, a plaintiff must allege "(1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by defendant, and (4) resultant injury to the plaintiff."  *Zahdan v. Frontline Bus. Enter. Inc.*, 241 N.E.3d 1040, 1049–50 (Ill. App. Ct. 2024).

McDonald's argues that McPherson has not adequately pled the second and third elements.  Specifically, McDonald's thinks that McPherson has not identified a breach of contract within the statute of limitations by McDonald's, nor has he adequately pleaded his own performance under the contract.  *See* Defs.' Mem. in Supp. of Mtn. to Dismiss, at 19–24 (Dckt. No. 23).  The Court will address those arguments one at a time.

#### 1.      Breach of Contract

A breach of contract "requires an identifiable breach of contract term."  *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614–15 (7th Cir. 2019).  In other words, McPherson needs to identify a specific contract term that McDonald's allegedly breached.

McPherson points to three sections of the franchise agreement that he thinks McDonald's breached:  section 3, section 12, and section 15(d).  So, the Court will address each section in

47

turn to determine whether McPherson has adequately alleged a breach. But first, the Court needs to explain the rules of the road.

When interpreting a contract, the aim is "to ascertain and give effect to the intent of the parties." *See Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. Ct. 2006). That inquiry focuses on "the objective manifestations of the parties, including the language they used in the contract." *Id.* "Where the language of a contract is plain, it provides the best evidence of the parties['] intent and will be enforced as written." *Id.*

### a.     Section 3

Section 3 of the franchise agreement says that "McDonald's shall also make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants." *See* Defs.' Ex. 1, at 78 (Dckt. No. 23-1).

McPherson thinks that McDonald's violated section 3 by "not providing [him] the rent relief and other financial assistance Defendants provided to white franchisees," and "conducting reviews of [his] restaurants at unreasonable times and under unreasonable circumstances that Defendants did not impose on white franchisees." *See* Cplt., at ¶ 172 (Dckt. No. 1).

McDonald's has a few responses. McDonald's starts with what it thinks is a silver bullet. McDonald's points to the language from the franchise disclosure document stating that "McDonald's is not required to provide you [the franchisee] with any assistance." *See* Defs.' Ex. 1, at 33 (Dckt. No. 23-1). As McDonald's sees things, that language disclaims any obligation McDonald's had to its franchisees to provide any assistance.

48

But that argument doesn't get very far, because that line of the contract includes an important caveat that McDonald's omitted: "*Except as listed below*, McDonald's is not required to provide you with any assistance." *Id.* (emphasis added).

Lo and behold, one of the obligations listed below is the obligation McPherson now cites: "We will make available to you all additional services, facilities, rights, and privileges relating to the operation of the restaurant that we make generally available to all our franchisees operating McDonald's restaurants (Franchise Agreement – Section 3)." *Id.* at 34. So the Golden Arches don't have a silver bullet after all.

Next, McDonald's argues that the additional "services, facilities, rights, and privileges" in question did not include rent relief or the right to not be inspected in certain ways.[11]

McDonald's thinks that other provisions of the contract disclaim any entitlement McPherson had to rent relief. McDonald's points to section 1(f) of the franchise agreement, which requires franchisees to "pay to McDonald's all required payments." McDonald's also relies on section 28(c) of the franchise agreement, which reiterates that "[n]o representation has been made by McDonald's as to the future profitability of the Restaurant." *Id.* at 93, 105.

---

[11] McDonald's also argues, in a footnote, that other courts have limited the "services, facilities, rights, and privileges relating to the operation of the restaurant" described in section 3 to "details of restaurant operations such as food, service and the supplying of standardized equipment." *See* Defs.' Mem. in Supp. of Mtn. to Dismiss, at 20 n.7 (Dckt. No. 23). This Court thinks that reading is too limited. In the case McDonald's cites, the district court read section 3 narrowly to avoid conflicting with other contractual provisions. *See McDonald's Corp. v. C.B. Mgmt. Co., Inc.*, 13 F. Supp. 2d 705, 712 (N.D. Ill. 1998) ("In the face of the clear contractual language governing termination, we decline to read [section] 3 in such a way that would render the contract internally contradictory."). But there is no such conflict with other contractual provisions here. And, in any event, the Court thinks that a broad reading of section 3 is more persuasive. The "ordinary meaning" of the words "relating to" is "a broad one." *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992); *see also Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012) (recognizing that courts read "relating to" broadly in the context of contracts). Read broadly, rent relief could be a privilege relating to the operation of the restaurant. After all, a franchisee must pay rent to operate the restaurant.

This Court disagrees. True, "[a] contract should be construed as a whole." *See Sevugan*, 931 F.3d at 618. But sections 1(f) and 28(c) of the franchise agreement establish only that McDonald's had no obligation to provide rent relief to any franchisees.

Once McDonald's made certain privileges, like rent relief, generally available to its franchisees, sections 1(f) and 28(c) do *not* preclude a breach of contract claim under section 3. If McDonald's did make the privilege of rent relief generally available to its other franchisees, but didn't make that same privilege available to McPherson, that disparate treatment would violate section 3. McPherson did not receive a "generally available" benefit if he got the short end of the stick.

And McPherson alleges exactly that. McPherson alleges that he wasn't provided rent relief, even though McDonald's provided rent relief to other, white franchisees. That's a plausible breach of section 3.

### b. Section 12

Section 12 of the franchise agreement says that "McDonald's shall have the right to inspect the Restaurant at all reasonable times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's system." *See* Defs.' Ex. 1, at 97 (Dckt. No. 23-1). The contract gives McDonald's a right to inspect the restaurants "at all reasonable times." *Id.*

McPherson thinks that section 12 creates an implicit restriction, and prohibits McDonald's from doing inspections at unreasonable times. That reading then morphs into a broader theory that McDonald's cannot do unreasonable inspections.

McPherson claims that McDonald's breached its obligation under section 12 by "conducting reviews of his restaurant at unreasonable times and under unreasonable

50

circumstances, including during the outbreak of the COVID-19 pandemic, when it had paused inspections nationwide." *See* Cplt., at ¶ 173 (Dckt. No. 1).

On the flip side, McDonald's thinks that it could not have breached section 12, because section 12 doesn't impose any obligations on McDonald's.

The Court agrees with McDonald's. Section 12 gives McDonald's the right to inspect the franchisee's restaurant at reasonable times, but doesn't say anything about McDonald's having a duty to not inspect the restaurant at other times. *See* Oral Ruling Tr., at 27:9-17, *Crawford v. McDonald's USA, LLC*, No. 20-cv-5132 (N.D. Ill. 2022) ("That section only imposed obligations on the plaintiffs to maintain up-to-date and compliant restaurants. It did not require McDonald's to inspect or not inspect the properties. It did not require McDonald's to impose or not impose certain renovation requirements.").

Section 12 entitles McDonald's to inspect the restaurants at reasonable times. It does not prohibit McDonald's from inspecting the restaurants at other times. Section 12 may not vest McDonald's with an absolute right to inspect the restaurants whenever it wants. But section 12 does not include rights-vesting language in favor of the franchisee, either.

Maybe, just maybe, a franchisee could bring a claim if McDonald's insisted on inspecting a restaurant at 3:00 a.m. on Christmas morning. But McPherson doesn't allege anything in that ballpark. He seems to object that McDonald's continued inspections during Covid-19. Section 12 did not require McDonald's to take a time-out during the pandemic.

"Only a duty imposed by the terms of a contract can give rise to a breach." *See W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004). Here, section 12 did not impose a duty. So, McPherson does not plausibly allege a breach of section 12.

51

### c.    Section 15

Section 15(d) of the franchise agreement says that "Franchisee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent." *See* Defs.' Ex. 1, at 100 (Dckt. No. 23-1). But it also provides that "[s]uch consent shall not be arbitrarily withheld." *Id.*

McPherson thinks that McDonald's breached the contract when it "arbitrarily refused to accept the terms of sale proposed by [McPherson] when he attempted to sell his New York stores to a fellow owner/operator," and by "insist[ing] that [McPherson] sell his stores to buyers hand-picked by Defendants." *See* Cplt., at ¶ 174 (Dckt. No. 1).

McDonald's first argues that section 15(d) doesn't impose any obligations on McDonald's. But that argument is contradicted by the text, which states that McDonald's "consent *shall not* be arbitrarily withheld." *See* Defs.' Ex. 1, at 100 (Dckt. No. 23-1). So, McDonald's has an obligation to not arbitrarily withhold consent from sales.

Next, McDonald's argues that McPherson hasn't alleged that McDonald's arbitrarily withheld consent from a sale, transfer, or assignment within the statute of limitations. The Court agrees.

The complaint points to two instances where he sold his stores. The first is about when McPherson tried to sell his two New York stores in 2001 to Wong, the only franchisee of color in that area, but McDonald's would not consent to the sale. *See* Cplt., at ¶¶ 78–79. Instead, McDonald's would allow McPherson to sell only to white franchisees. *Id.* at ¶¶ 79–80.

Those allegations squarely allege that McDonald's arbitrarily withheld consent from McPherson's sale to Wong. But the complaint also squarely alleges that the proposed sale was in 2001 – far outside the ten-year statutory limitations period. *Id.* at ¶¶ 77, 80. So, even if

52

McDonald's did arbitrarily withhold consent from the sale to Wong, that breach is now time-barred and no longer actionable.

McPherson's second allegation is about when McPherson tried to sell his final Baltimore stores, which were all in low-income, high-crime areas, and McDonald's directed him to sell only to buyers who were all black or people of color. *Id.* at ¶ 143.

Those allegations have the opposite problem as his earlier allegations. Allegations from 2021 are squarely within the statute of limitations, so they're not time barred. But his allegations from 2021 don't state a plausible breach of section 15(d).

The company's contractual obligation is to not "arbitrarily withhold" its "consent" to a sale, transfer, or assignment. *See* Defs.' Ex. 1, at 84 (Dckt. No. 23-1). But McPherson doesn't allege that McDonald's withheld consent from a proposed sale in 2021. McPherson doesn't allege, for example, that he had a white buyer lined up, and McDonald's balked.

Instead, McPherson says that McDonald's "directed him to buyers who were all Black or people of color." *See* Cplt., at ¶ 143 (Dckt. No. 1). Under those allegations, McDonald's didn't withhold consent from anything, because McPherson didn't propose any sale, transfer, or assignment that McDonald's could shoot down. And that means that McPherson can't state a claim for breach of section 15(d).

To recap, McPherson hasn't plausibly alleged a breach of section 12 or section 15 of the franchise agreement. But he has plausibly alleged a breach of section 3 of the franchise agreement.

### 2. Performance

Next, McDonald's argues that McPherson has not adequately pleaded his own performance under the contract. As McDonald's sees things, McPherson doesn't plead

substantial performance, besides a conclusory allegation that he "performed his obligations under the contract." *See* Cplt., at ¶ 170 (Dckt. No. 1).

McDonald's asks for too much. McPherson alleged a lot, and McDonald's doesn't need more. It has enough to satisfy the purposes of notice pleading.

Candidly, this Court sees little point in forcing McPherson to plead more details. If push came to shove, McPherson presumably would add a few details saying that he complied with all applicable agreements. McDonald's already knows that that's his position.

\* \* \*

To sum it up, the complaint states a claim for breach of section 3 of the franchise agreement. But the complaint does not state a claim for breach of section 12 or section 15.

## IV. Tortious Interference Claim (Count V)

McPherson's last claim is tortious interference. A tortious interference claim comes in two varieties. The complaint alleged one variety, but McPherson's brief argued the other.

The complaint alleges that McDonald's tortiously interfered with his existing business relationships. He claims that he "had valid business relationships with one or more individuals or entities, including but not limited to fellow franchisees with stores for sale," and that McDonald's knew about and interfered with those business relationships. *See* Cplt., at ¶¶ 177–79 (Dckt. No. 1).

In its motion to dismiss, McDonald's treats McPherson's claim as a tortious interference claim involving his *existing* business relationships. *See* Defs.' Mem. in Supp. of Mtn. to Dismiss, at 24 (Dckt. No. 23).

But in his response brief, without any explanation, McPherson swapped horses. McPherson restyled his claim as one of tortious interference with *prospective* economic

54

advantage. *See* Pl.'s Resp. in Opp. to Defs.' Mtn. to Dismiss, at 10 (Dckt. No. 28). That's a different claim altogether.[12] It's about "interference *before* there is a contract," not interference with an existing contract. *See Brinley Holdings Inc. v. RSH Aviation, Inc.*, 580 F. Supp. 3d 520, 556 (N.D. Ill. 2022).

"[A] plaintiff may not amend his complaint in his response brief." *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). So, that's an independent reason to dismiss McPherson's tortious-interference-with-business-relationships claim, because he has seemingly abandoned his original claim and tried to bring a new claim without seeking leave to amend.

That said, McPherson's claim fails, regardless of whether it is about existing business relationships (as pleaded) or about prospective ones (as briefed).

## A. The Statute of Limitations

The Court starts again with the statute of limitations. Tortious-interference claims (of any kind) have a five-year statute of limitations. *See Poulos v. Lutheran Soc. Servs. of Illinois, Inc.*, 728 N.E.2d 547, 559 (Ill. App. Ct. 2000); *Hi-Lite Prods. Co. v. Am. Home Prods. Corp.*, 11 F.3d 1402, 1410 (7th Cir. 1993). And a claim accrues when the interference happens. *See Hi-Lite Prods.*, 11 F.3d at 1410. So, to the extent that McPherson relies on allegations before May 9, 2018, his claim is time barred.

---

[12] Illinois courts use various titles to describe the tort of "tortious interference with prospective economic advantage," including "tortious interference with prospective business relationships" or "tortious interference with prospective expectancies." *See Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 229 N.E.3d 869, 874 n.3 (Ill. App. Ct. 2023). So, the Court emphasizes that the important difference is not because he switched out the words "business relationships" with "economic advantage" – the important difference is the late-breaking inclusion of the word "prospective."

### B.    The Failure to State a Claim

The Court now turns to whether McPherson's factual allegations from within the limitations period state a claim (under either version of his tortious-interference claim).

### 1.    Tortious Interference with (Existing) Business Relationships

To state a claim for tortious interference with business relationships, McPherson must plead "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by the defendant's wrongful conduct, and (5) damages." *See Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989).

McDonald's argues that McPherson hasn't pleaded the fourth element – that a third party breached a contract with him because of the company's conduct. This Court agrees.

Under Illinois law, a claim for tortious interference with business relationships requires interference "directed at a third party which cause[d] that party to breach its contract with the plaintiff." *See George A. Fuller Co. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983) (citing *Mitchell v. Weiger*, 409 N.E.2d 38, 41 (Ill. App. Ct. 1980)); *see also Webb*, 906 F.3d at 577. McPherson hasn't alleged that a third party breached a contract with him.

And, in any event, to the extent that McPherson is still pursuing a claim of tortious interference with existing business relationships, that claim is waived. He has "effectively abandon[ed]" his claim "by not responding to the alleged deficiencies in [the] motion to dismiss." *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

56

Either way, McPherson's claim of tortious interference with existing business relationships is dismissed.

### 2. Tortious Interference with Prospective Economic Advantage

The Court now turns to McPherson's newly refashioned claim of tortious interference with prospective economic advantage. Again, this claim doesn't appear in the complaint, and emerged for the first time in McPherson's brief.

So the ball isn't really at play. Even so, for good measure, the Court will hit the ball.

To state a claim for tortious interference with prospective economic advantage, a plaintiff must plead "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *See Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (quoting *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1133–34 (Ill. 2001)).

McDonald's argues in its reply brief that McPherson has not alleged either a "reasonable expectancy of entering into a valid business relationship" or "an intentional and unjustified interference" by McDonald's within the statutory limitations period. *See* Defs.' Resp. Brf. in Supp. of Mtn. to Dismiss, at 15 (Dckt. No. 32).

This Court again agrees with McDonald's. McPherson doesn't allege that he anticipated entering into any valid business relationships, and that McDonald's interfered with that expectancy within the limitations period.

McPherson does have a slew of allegations about being blocked from entering certain business relationships. For example, he alleges that McDonald's blocked the sale of his New

York restaurants to Wong in 2001. *See* Cplt., at ¶¶ 78–80 (Dckt. No. 1). And he alleges that McDonald's stopped him from buying lucrative stores in affluent white neighborhoods, in 2001 and again in 2010. *Id.* at ¶¶ 92, 96–97. But those allegations involved actions that took place far outside the five-year statutory limitations period and are thus no longer actionable. *Id.*

So, McPherson hangs his hat on his final allegation about when he sold his final stores in 2021. *Id.* at ¶ 143. Those allegations are within the statutory limitations period. But he doesn't allege that McDonald's interfered with any prospective business relationship, because he doesn't allege that he had any prospective business relationship at all.

Unlike his other allegations, he doesn't talk about a deal that was supposed to come to fruition. Instead, he simply alleges that McDonald's "directed him to buyers who were all black or people of color." *Id.* That's an allegation that McDonald's affirmatively tried to set him up for certain business relationships, not that McDonald's negatively interfered with some other prospective business relationships that McPherson was developing.

That's not enough to allege a reasonable expectancy of entering into a valid business relationship. "A reasonable expectancy requires more than a hope or opportunity of a future business relationship." *See Brinley Holdings*, 580 F. Supp. 3d at 556. McPherson may have hoped to sell his final stores to other parties, but he doesn't allege that he was even close to a deal. In fact, he doesn't even allege that other parties were in the picture. So, he doesn't allege that he had a reasonable expectancy of entering into a valid business relationship in 2021.

To sum it up, most of McPherson's allegations of tortious interference are time barred. The only allegation that isn't time-barred fails to state a claim for relief. McPherson's claim of tortious interference with prospective economic advantage is dismissed.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.

McPherson's pattern-or-practice discrimination claims under section 1981 (Count II) and section 1982 (Count IV) are dismissed. His tortious interference claim (Count VI) is also dismissed.

Defendants' motion to dismiss is granted in part and denied in part when it comes to the differential-treatments claims under section 1981 (Count I) and section 1982 (Count III).

For the differential-treatment claim under section 1981 (Count I), McPherson's allegations about pre-contract-formation conduct are untimely. McPherson's allegations about post-contract-formation conduct survives to the extent that it relies on discriminatory acts from after May 9, 2019.

For the differential-treatment claim under section 1982 (Count III), McPherson's allegations about pre-contract-formation conduct are untimely. McPherson's allegations about post-contract-formation conduct survives to the extent that it relies on discriminatory acts from after May 9, 2021.

Finally, McPherson's breach of contract claim (Count V) survives only as Defendants' alleged breach of Section 3 of the franchise agreement.

Date: March 27, 2026

Steven C. Seeger
United States District Judge

59