### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MITCHELL MCPHERSON, | |
| Plaintiff, | Case No.: 1:23-cv-02913 |
| v. | Hon. Steven C. Seeger |
| MCDONALD'S USA, LLC, a Delaware limited liability company, and MCDONALD'S CORPORATION, a Delaware corporation, | |
| Defendants. | |

### DEFENDANTS MCDONALD'S USA, LLC'S AND MCDONALD'S CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendants McDonald's USA, LLC ("McDonald's USA") and McDonald's Corporation ("McDonald's Corp.," together with its subsidiaries, the "Company," and collectively with McDonald's USA, "Defendants"), upon personal knowledge and/or upon information and belief, respectfully submit this Answer and Affirmative Defenses to Plaintiff's Complaint as follows:[1]

---

[1] As set forth in the Court's ruling on Defendants' Motion to Dismiss, several of Plaintiff's claims were dismissed, and the surviving claims are subject to different statutes of limitation. *See* Memorandum Opinion and Order (N.D. Ill. Mar. 27, 2026) (Dkt. No. 43). The Court held that Plaintiff may proceed only on his Section 1981 and Section 1982 differential-treatment claims (Counts I and III), and only as to alleged discriminatory acts occurring after May 9, 2019, and May 9, 2021, respectively. *Id*. The Court dismissed Counts II, IV, and VI in their entirety and confined the breach of contract claim (Count V) to any alleged breach of Section 3 of the franchise agreement. *Id*. The Court also recognized that the shorter, two-year statute of limitations applicable to Section 1982 claims may ultimately bar certain allegations, such as those concerning alleged racial steering in connection with Plaintiff's 2021 efforts to transfer ownership of his McDonald's-branded restaurants, as well as allegations relating to rent relief and inspections that concluded when ownership was transferred. *Id*. at n.7. The Court explained that while time-barred conduct cannot itself support liability, such conduct may, in some circumstances, serve as "background evidence in support of timely claims." *Id.* at 33. At the same time, the Court cautioned that the admissibility of an extended "backstory" is not assured and may be limited. *Id.* at n.4. Considering the Court's guidance, Defendants respond to all allegations in the Complaint to avoid premature disputes over what may qualify as contextual background and to prevent any implication that Defendants have conceded or otherwise waived objections to particular allegations. Defendants do so without waiver of applicable statute-of-limitations defenses.

## INTRODUCTION[2]

Defendants respond to the allegations in Plaintiff's Complaint as follows:

1.      This case arises from McDonald's racial discrimination against Mitchell McPherson.

**ANSWER:**    Defendants admit that Plaintiff filed this lawsuit and that the claims are set out in the Complaint. Defendants deny, however, that they engaged in racial discrimination in the contracting process or in the leasing of real property, deny that they interfered with or are otherwise in breach of contract with Plaintiff, and deny that Plaintiff is entitled to any relief. Defendants further deny all other allegations that may be reasonably inferred from, or purportedly incorporated into, Paragraph 1 of the Complaint.

2.      Plaintiff Mitchell McPherson is a Black, former McDonald's franchisee who was forced out of the McDonald's system due to McDonald's systematic racial discrimination.

**ANSWER:**    Defendants admit Plaintiff identifies his race as Black and that Plaintiff is a former franchisee of McDonald's-branded restaurant businesses operated under franchise agreements with McDonald's USA. Defendants deny the remaining allegations in Paragraph 2 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices,[3] including any implication that McDonald's USA forced Plaintiff out of the

---

[2] The headings in Plaintiff's Complaint are not substantive allegations to which a response is required; accordingly, Defendants provide no answer or response thereto.

[3] While Plaintiff purports to define the term "McDonald's" as referring collectively to the named Defendants McDonald's Corp. and McDonald's USA, *see* ¶ 19, Plaintiff often uses the term "McDonald's" to make brand-related allegations that seemingly are not directed at any particular entity, *see*, *e.g.*, ¶ 2 (referencing the "McDonald's system"); *id*. ¶ 21 (referencing "McDonald's products"). To the extent Defendants can reasonably ascertain the entity to which specific allegations are directed, Defendants have so answered. Where Defendants cannot reasonably do so—in particular, as it relates to generalized allegations about the McDonald's brand or historical practices—Defendants use the term McDonald's or Defendants as appropriate in context. Defendants' use of collective terms like "Defendants" or "McDonald's" should not be construed as waiving any argument that McDonald's Corporation and McDonald's USA are separate legal entities, or related affirmative defenses.

McDonald's USA's franchise system, treated Black franchisees differently from any other franchisee, or engaged in any form of racial discrimination. Defendants further deny that Plaintiff was a McDonald's Corp. franchisee or otherwise had any contractual relationship with McDonald's Corp.

3. Plaintiff put his heart and soul into his dreams of owning and operating McDonald's stores and building generational wealth for his family.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint, and therefore deny them.

4. As Plaintiff sought to grow his business from two successful suburban stores in New York, McDonald's directed that Plaintiff, solely because he was Black, could only franchise and operate stores that were in predominantly Black neighborhoods. These stores had lower sales and profits than McDonald's stores in white neighborhoods. McDonald's refused to allow Plaintiff to become a franchisee in white neighborhoods.

**ANSWER:** Defendants deny the allegations in Paragraph 4 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's steered franchisees on the basis of race, restricted Plaintiff to operating restaurants in predominantly Black neighborhoods, or treated Black franchisees differently from white franchisees with respect to franchise opportunities or locations.

5. McDonald's executives intentionally placed Plaintiff in these stores based on the racist belief that customer sales would increase—and that McDonald's bottom line would therefore improve—if stores were operated by individuals who had the same skin color as the rest of the community.

**ANSWER:** Defendants deny the allegations in Paragraph 5 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that Defendants placed Plaintiff in particular restaurants on the basis of race, acted on any racially motivated beliefs about customer behavior, or engaged in any form of racial

3

discrimination. Defendants further deny that Plaintiff was a McDonald's Corp. franchisee or otherwise had any contractual relationship with McDonald's Corp.

6.    After McDonald's persistent urging, Plaintiff agreed to purchase a package of stores in Baltimore, Maryland, which he operated from 2001 to 2021.

**ANSWER:**    Defendants admit only that Plaintiff operated franchised McDonald's-branded restaurant businesses in Baltimore from 2001 until 2021. Answering further, Defendants deny the remaining allegations in Paragraph 6 of the Complaint.

7.    Once Plaintiff took on the Baltimore stores, McDonald's continued to discriminate against him based on his race and breached its agreements with Plaintiff. McDonald's refused to offer Plaintiff the same support that McDonald's offered white franchisees, and McDonald's subjected Plaintiff to harassing treatment that it never directed at white franchisees.

**ANSWER:**    Defendants deny the allegations in Paragraph 7 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any implication that Defendants treated Plaintiff differently from other franchisees on the basis of race, failed to provide support on the basis of race, or engaged in any form of racial discrimination.

8.    Plaintiff was forced to pay significantly higher operating costs than his white counterparts due to security costs, higher insurance rates, and higher employee turnover. Yet, when confronted with the economic harms it had caused, McDonald's refused to provide Plaintiff with any of the needed financial assistance, including rent relief. Meanwhile, McDonald's routinely provided such assistance, including rent relief, to white owner/operators, who did not face nearly as serious operating challenges.

**ANSWER:**    Defendants deny the allegations in Paragraph 8 of the Complaint. Answering further, Defendants deny Plaintiff's characterizations of McDonald's practices, including any implication that Defendants required Plaintiff to incur higher operating costs on the basis of race, denied him financial assistance on the basis of race, or engaged in any form of racial discrimination.

9.    Moreover, when Plaintiff approached McDonald's about purchase opportunities in affluent white communities—stores that could have given him the financial cash flow to help pay

4

costs at his lower-profit locations—McDonald's uniformly denied him those opportunities because he was Black.

**ANSWER:** Defendants deny the allegations in Paragraph 9 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any implication that Defendants denied Plaintiff purchase opportunities on the basis of race or engaged in any form of racial discrimination.

10. McDonald's employed a well-honed practice when it identified a Black franchisee it wanted to force out of the system: ramping up unannounced inspections at all times of the day and night to find infractions McDonald's could use to justify a poor business review. In turn, McDonald's drew upon these poor business reviews to deem franchisees ineligible for expansion or deny renewal of their leases. In contrast, when McDonald's wanted to keep a white franchisee in the system, McDonald's provided extensive advanced notice of their planned inspections, and helped prepare white franchisees for a successful inspection.

**ANSWER:** Defendants deny the allegations in Paragraph 10 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any implication that Defendants targeted Plaintiff or other franchisees for inspections, business reviews, or other treatment on the basis of race or engaged in any form of racial discrimination.

11. Plaintiff was no exception to this practice, as McDonald's ramped up inspections to force Plaintiff out of the system.

**ANSWER:** Defendants deny the allegations in Paragraph 11 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any implication that Defendants targeted Plaintiff for inspections or sought to remove him from the system on the basis of race or engaged in any form of racial discrimination.

12. McDonald's racially discriminatory business practices were compounded by additional overt displays of racism by McDonald's, up and down the chain of command. The routine racist indignities that Plaintiff suffered included several McDonald's managers verbally attacking and denigrating Plaintiff without consequence.

**ANSWER:** Defendants deny the allegations in Paragraph 12 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any

5

implication that Defendants engaged in overt displays of racism, that any manager or employee verbally attacked or denigrated Plaintiff on the basis of race or without consequence, or that Defendants engaged in any form of racial discrimination.

13.     McDonald's intentional discrimination against Plaintiff based solely on the fact that he was Black directly caused him extreme harm. Among other things, McDonald's discriminatory and illegal actions devastated Plaintiff's livelihood, deprived him of valuable opportunities, and ruined his physical and emotional health. Without McDonald's intentional race discrimination against Plaintiff, he would never have suffered this harm.

**ANSWER:**     Defendants deny the allegations in Paragraph 13 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any implication that Defendants engaged in racial discrimination or that any alleged conduct by Defendants caused Plaintiff harm. Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning his livelihood, lost opportunities, or physical or emotional health, and therefore deny them.

14.     Plaintiff now seeks to recover for the harm McDonald's caused and to redress the race discrimination and other tortious conduct he suffered at the hands of McDonald's.

**ANSWER:**     Defendants deny the allegations in Paragraph 14 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any implication that Defendants engaged in racial discrimination, other tortious conduct, or any conduct that caused Plaintiff harm.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, §1332, and § 1367.

**ANSWER:**     Defendants admit only that Plaintiff purports to invoke subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. Answering further, Defendants deny (i) the substantive fact allegations in the Complaint that Plaintiff asserts against the Defendants; and (ii) that Plaintiff is entitled to the relief sought in the Complaint.

6

16.     This Court has personal jurisdiction over Defendants McDonald's USA, LLC and McDonald's Corporation because each of their principal places of business is in the State of Illinois and because they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction.

**ANSWER:**     Defendants admit only that Plaintiff asserts this Court has personal jurisdiction over Defendants and admit that their respective principal places of business are in Chicago, Illinois. To the extent that Paragraph 16 contains statements or conclusions of law, no response is required. Answering further, Defendants deny (i) the substantive fact allegations in the Complaint that Plaintiff asserts against the Defendants; and (ii) that Plaintiff is entitled to the relief sought in the Complaint. Defendants deny any remaining allegations in Paragraph 16 of the Complaint.

17.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim have occurred and are occurring in the Northern District of Illinois, and Defendants transacted affairs and conducted activity that gave rise to the claim of relief in this District. Further, both Defendants' principal place of business is in this District.

**ANSWER:**     Defendants admit only that Plaintiff asserts that venue is proper in this Court under 28 U.S.C. § 1391 and admit that their respective principal places of business are in Chicago, Illinois. To the extent that Paragraph 17 contains statements or conclusions of law, no response is required. Answering further, Defendants deny (i) the substantive fact allegations in the Complaint that Plaintiff asserts against the Defendants; and (ii) that Plaintiff is entitled to the relief sought in the Complaint. Defendants deny any remaining allegations in Paragraph 17 of the Complaint.

**PARTIES**

18.     Plaintiff Mitchell McPherson is a Maryland resident. He is Black.

**ANSWER:**     Defendants admit only that Plaintiff identifies his race as Black. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18 of the Complaint, and therefore deny them.

19.     Defendant McDonald's Corporation is incorporated in Delaware and maintains its principal place of business in Illinois. Defendant McDonald's USA, LLC, the franchisor for

7

McDonald's in the United States, is a wholly owned subsidiary of McDonald's Corporation that is similarly incorporated in Delaware and operates its principal place of business in Illinois. For ease of reference, both defendants are referred to collectively as "McDonald's" throughout the complaint.

**ANSWER:** Defendants admit that McDonald's Corp. is a Delaware corporation with its principal place of business in Illinois and admit that McDonald's USA is a Delaware limited liability company with its principal place of business in Illinois. Answering further, Defendants admit that McDonald's Corp. is the sole member of McDonald's USA and that McDonald's USA is the franchisor of McDonald's-branded restaurants in the United States. Defendants acknowledge that Plaintiff refers to both entities collectively as "McDonald's" but deny that this is an accurate characterization because both are separate legal entities. Answering further, Defendants deny any remaining allegations in Paragraph 19 of the Complaint.

## FACTUAL ALLEGATIONS

20. McDonald's business model depends on its franchisees. Out of McDonald's 38,000 locations around the globe, approximately 93% are operated by franchisees. McDonald's retains control of the remaining locations through its wholly owned subsidiary, McDonald's Operations Co. ("McOpCo"). McDonald's earns roughly 69% of its $21-23 billion in annual revenue from the rents and fees it charges its franchisees.

**ANSWER:** Defendants admit only that McDonald's USA is the franchisor of McDonald's-branded restaurant locations in the United States and that McDonald's Corp., through wholly owned subsidiaries, owns and operates some company-owned McDonald's-branded restaurant locations. Answering further, Defendants admit that a portion of Defendants' annual revenue is derived from rents and fees paid by franchisees. Defendants deny Plaintiff's characterization of "McOpCo" and deny that McOpCo performs the functions alleged. Defendants deny the remaining allegations in Paragraph 20 of the Complaint.

21. As the franchisor, McDonald's develops and oversees McDonald's restaurants, including a specific menu of food items. McDonald's owns or leases the land on which the restaurants are located. Franchisees, also known as owner/operators, are granted the right to

operate a specific McDonald's restaurant and sell McDonald's products in exchange for fees and an agreement to pay rent.

**ANSWER:** Defendants admit that McDonald's USA develops, franchises, and services a franchisee-owned and operated system of McDonald's-branded restaurants in the United States that prepare, assemble, package, and sell a standardized menu of food and beverage products. Answering further, Defendants admit that franchisees are granted the right to operate specific McDonald's-branded restaurant locations in exchange for monetary payments to McDonald's USA as provided in the franchise agreement between McDonald's USA and each individual owner-operator franchisee. Defendants deny the remaining allegations in Paragraph 21 of the Complaint.

22. For a traditional restaurant, a franchisee will oversee a restaurant at a dedicated McDonald's location with a full menu. The typical franchise term for this type of restaurant is set at 20 years.

**ANSWER:** Defendants admit only that franchisees are granted the right to operate certain McDonald's-branded restaurants for a specified term as provided in the franchise agreement between McDonald's USA and each individual owner-operator franchisee. Defendants deny the remaining allegations in Paragraph 22 of the Complaint.

23. What McDonald's pitches as a tremendous growth opportunity to prospective franchisees is more akin to a sharecropper system, in which McDonald's provides the land and reaps the rewards of its franchisees' labor. This power imbalance is captured in McDonald's standard franchise agreement, which it executes with each of its franchisees.

**ANSWER:** Defendants deny the allegations in Paragraph 23 of the Complaint.

24. The Agreement stipulates that franchisees must meet a stringent set of requirements and pay a variety of fees to McDonald's. Fees include rent based on a percentage of the location's gross sales, collective advertising costs, a monthly service fee subject to gross sales, and royalties.

**ANSWER:** Defendants admit only that the terms of the franchise relationship between McDonald's USA and each individual owner-operator franchisee are set out in the franchise

agreement, and that the document speaks for itself. Defendants deny the remaining allegations in

Paragraph 24 of the Complaint. Answering further, Defendants specifically deny that owner-

operator franchisees have a contractual relationship with McDonald's Corp.

25. Franchisees bear the costs of operations. These operational costs include insurance, maintenance, and equipment, like kitchen fixtures and lighting, all of which must satisfy standards that McDonald's sets. All franchisees must comply with all of McDonald's requirements for quality, service, and cleanliness, as well as any new or existing procedures McDonald's imposes, which McDonald's enforces unevenly depending on the race of the franchisee.

**ANSWER:** Defendants admit only that the terms of the franchise relationship between

McDonald's USA and each individual owner-operator franchisee are set out in the franchise

agreement, and that the document speaks for itself. Defendants deny the remaining allegations in

Paragraph 25 of the Complaint. Answering further, Defendants specifically deny that owner-

operator franchisees have a contractual relationship with McDonald's Corp.

26. Even though the Agreement is favorable to McDonald's, McDonald's retains obligations to its franchisees. Under the Agreement, McDonald's pledges to "make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants." (Franchise Agreement ¶ 3) (emphasis added).

**ANSWER:** Defendants admit only that the terms of the franchise relationship between

McDonald's USA and each individual owner-operator franchisee are set out in the franchise

agreement, and that the document speak for itself. Defendants deny the remaining allegations in

Paragraph 26 of the Complaint. Answering further, Defendants specifically deny that owner-

operator franchisees have a contractual relationship with McDonald's Corp.

27. Additionally, McDonald's reserves the right to inspect a franchisee's restaurant but only at "reasonable times to ensure that [the] Franchisee's operation" complies with McDonald's standards and policies.

**ANSWER:** Defendants admit only that the terms of the franchise relationship between

McDonald's USA and each individual owner-operator franchisee are set out in the franchise

agreement, and that the document speaks for itself. Defendants deny the remaining allegations in Paragraph 27 of the Complaint. Answering further, Defendants specifically deny that owner-operator franchisees have a contractual relationship with McDonald's Corp.

28.     Given that the typical lease term is set at 20 years, McDonald's begins discussions about whether to renew a franchisee's lease at least three years prior to the lease's expiration.

**ANSWER:**     Defendants admit only that the franchise is term-limited and that the rewrite process for a franchise typically begins in the third calendar year prior to the expiration of that franchise. Defendants deny the remaining allegations in Paragraph 28 of the Complaint. Answering further, Defendants specifically deny that owner-operator franchisees have a contractional relationship with McDonald's Corp.

29.     If a franchisee wishes to extend his or her lease or expand to additional locations, the franchisee and McDonald's engage in discussions about potential extensions or expansions.

**ANSWER:**     Defendants deny the allegations in Paragraph 29 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of the expansion and renewal process, including any implication that franchisees possess a right to expansion or renewal or that Defendants are obligated to engage in discussions regarding such matters. Any decisions by McDonald's USA regarding expansion or renewal of a given franchise are discretionary and not contractual.

30.     Expansion and ownership of multiple stores is key to a franchisee's success at McDonald's. Owning multiple stores gives a franchisee breathing room if one store dips in sales or requires a costly renovation.

**ANSWER:**     Defendants admit only that ownership of multiple franchise restaurants can provide an opportunity for increased financial stability. Defendants deny the remaining allegations in Paragraph 30 of the Complaint. Answering further, Defendants deny any allegations that rely on vague, subjective, or undefined terms (including, without limitation, "key," "success," "breathing

room," "dips in sales," or "costly renovation") or that purport to characterize the McDonald's USA's franchise system or any franchisee's experience.

31. In the past, McDonald's applied a 40-mile standard for expansion, meaning that operators were encouraged to not to expand beyond a 40-mile radius from their stores' location. More recently, McDonald's has relaxed that standard and allowed operators to purchase stores beyond the 40-mile radius, though it has done so only with white franchisees.

**ANSWER:** Defendants deny the allegations in Paragraph 31 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's USA's practices or procedures regarding the operation of multiple restaurants by a particular owner-operator, including any implication that Defendants engaged in race-based decision-making or discrimination.

32. If a franchisee decides to sell a location, he or she must first receive McDonald's written consent. The franchisee must provide McDonald's at least 20 days' notice of their intention to sell, along with the name and address of the prospective buyer, and the terms and conditions of the agreement. McDonald's reserves the right of first refusal, meaning that it has the first option to purchase the restaurant.

**ANSWER:** Defendants admit only that the terms of the franchise relationship between McDonald's USA and each individual owner-operator franchisee are set out in the franchise agreement, and that the document speaks for itself. Defendants deny the remaining allegations in Paragraph 32 of the Complaint. Answering further, Defendants specifically deny that owner-operator franchisees have a contractual relationship with McDonald's Corp.

33. In evaluating whether to provide consent for a sale, McDonald's may consider the prospective purchaser's "work experience and aptitude; financial background; character; ability to personally devote time and best efforts to managing the Restaurant; residence in the locality of the Restaurant; equity interest in the Restaurant; conflicting interests; and such other criteria and conditions as McDonald's shall then apply." Franchise Agreement § 15(d). However, "[s]uch consent shall not be arbitrarily withheld." *Id*.

**ANSWER:** Defendants admit only that the terms of the franchise relationship between McDonald's USA and each individual owner-operator franchisee are set out in the franchise

agreement, and that the document speaks for itself. Defendants deny the remaining allegations in Paragraph 33 of the Complaint. Answering further, Defendants specifically deny that owner-operator franchisees have a contractual relationship with McDonald's Corp.

34.    Significantly, McDonald's does not employ an "open market" system for selling its stores. To purchase a store, a franchisee must either receive an offer from McDonald's for a particular location or a franchisee must hear about the store being put up for sale from the seller or through the grapevine. As a result, Black franchisees, including Plaintiff, were limited to purchasing restaurants McDonald's offered them—low-volume stores in dangerous locations—or to purchasing from other Black operators, who helped them access opportunities that were not accessible.

**ANSWER:**    Defendants deny the allegations in Paragraph 34 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any implication that Defendants classified franchisees by race, limited opportunities on the basis of race, or engaged in any form of racial discrimination.

35.    McDonald's employs a hierarchical system to oversee its franchisees. During Plaintiff's tenure, the President of McDonald's USA managed overall operations for the corporation's 14,000 restaurants across the country. Below the President, the Presidents of the East and West Divisions oversaw all restaurants in the eastern and western areas of the country, respectively. Within each of those two divisions, the General Manager or Regional Manager supervised franchisees within a particular region, as well as managed real estate and development strategy. The "Vice President and Regional Manager," along with the Vice President of Quality, Service, and Cleanliness ("QSCVP"), was responsible for all franchising decisions within a given region, including setting up the franchisee with a particular location and determining whether a franchisee was eligible for growth and rewrite. Field Service Managers or Representatives managed and developed strategy for a sub-set of franchisees and reported to the QSCVP. Finally, Business Consultants conducted graded visits and inspections, reporting back to the Field Service Manager, who in turn reported to the Director of Operations.

**ANSWER:**    Defendants deny the allegations in Paragraph 35 of the Complaint.

36.    At each stage of the franchising process, from selecting a franchise location to setting rental prices to approving the sale of a store and more, McDonald's employees intentionally discriminated against Black franchisees, including Plaintiff.

**ANSWER:**    Defendants deny the allegations in Paragraph 36 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any

13

implication that McDonald's discriminated against Plaintiff or other franchisees on the basis of race at any stage of the franchising process.

37.     McDonald's has a long history of discriminating against Black franchisees.

**ANSWER:**     Defendants deny the allegations in Paragraph 37 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's practices, including any implication that McDonald's has a history of discriminating against franchisees on the basis of race or engaged in any form of racial discrimination.

38.     Upon its founding in 1955, McDonald's installed its restaurants only in white neighborhoods and barred Black individuals from becoming franchisees.

**ANSWER:**     Defendants deny the allegations in Paragraph 38 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's historically installed restaurants based on race, barred individuals from becoming franchisees on the basis of race, or engaged in any form of racial discrimination.

39.     However, following white flight from urban areas in the late 1960s and 1970s and Martin Luther King's assassination in 1968, McDonald's began recruiting Black owner/operators to take over stores in cities. McDonald's approved only "zebra" or "salt and pepper" partnerships, in which Black franchisees partnered with a white owner/operator to purchase a location.

**ANSWER:**     Defendants deny the allegations in Paragraph 39 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that Defendants made franchising decisions on the basis of race or engaged in any form of racial discrimination.

40.     In 1972, McDonald's first Black owner/operator, Herman Petty, helped found the National Black McDonald's Operators Association (NBMOA) to advocate for Black franchisees.

**ANSWER:**     Defendants admit that Herman Petty was McDonald's USA's first Black franchisee and that he was among the founding members of the National Black McDonald's Operators

Association, which advocates for Black franchisees. Defendants deny the remaining allegations in Paragraph 40 of the Complaint.

41.     In 1982, McDonald's sued Charles Griffis, a Black owner/operator, for breach of contract after he bought two Popeyes franchise locations—a McDonald's competitor. Griffis countersued McDonald's for intentionally placing him in "ghetto" locations and restricting him from purchasing stores in suburban areas. McDonald's settled with Griffis for $4.7 million.

**ANSWER:**     Defendants admit that McDonald's Corp. sued Charles Griffis for breach of his franchise agreement and that Mr. Griffis filed a counterclaim alleging race discrimination. Answering further, Defendants admit that McDonald's Corp. reached an agreement with Mr. Griffis for $4.7 million in connection with resolving the litigation. Defendants deny the remaining allegations in Paragraph 41 of the Complaint.

42.     That same year, McDonald's began facing public allegations against McDonald's for its practice of "redlining" Black owner/operators by forcing them into agreements to operate older, lower-volume restaurants in need of costly renovations in Black neighborhoods.

**ANSWER:**     Defendants deny the allegations in Paragraph 42 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's engaged in "redlining," made franchising decisions on the basis of race, or discriminated against Black franchisees.

43.     Jesse Jackson's civil rights organization, PUSH, protested McDonald's practice of systematically placing Black franchisees in less desirable and higher-debt restaurants. The NAACP in Chicago and Los Angeles echoed those protests and organized boycotts of the restaurant chain.

**ANSWER:**     Defendants deny the allegations in Paragraph 43 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's systematically placed Black franchisees in less desirable or higher-debt restaurants or otherwise discriminated against Black franchisees.

44.     In 1996, McDonald's Executive Vice President Tom Dentice conceded in a letter that "for business reasons we thought were valid at the time, the company has placed many Black

Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers." McDonald's admitted that by discriminating against Black franchisees based on their race, it thought it would make more money. McDonald's placed franchisees in Black communities that reflected their race because McDonald's thought Black owners should be limited to Black communities because of the color of their skin. In addition, McDonald's thought that it would benefit McDonald's bottom line to put Black franchisees in Black communities. As a result, Black franchisees were placed in Black neighborhoods and could not purchase stores in suburban, white neighborhoods.

**ANSWER:** Defendants admit that Thomas Dentice served as an Executive Vice President for McDonald's USA in 1996 and that he wrote a letter to the then-president of NBMOA that included, in part, the quoted language. Defendants deny that the letter constitutes any concession or admission of discrimination or that McDonald's engaged in or ever engaged in any policy of making franchising decisions on the basis of race. Defendants deny the remaining allegations in Paragraph 44 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's placed franchisees on the basis of race or treated Black franchisees differently from any other franchisee.

45. Conversely, white franchisees were rarely, if ever, placed in stores that served Black consumers. Once placed in less profitable and more costly franchise locations, Black franchisees faced a series of security and operational issue. As a result, McDonald's forced Black franchisees to spend much more money than white counterparts on security and maintenance measures, including security guards.

**ANSWER:** Defendants deny the allegations in Paragraph 45 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's placed franchisees on the basis of race, treated Black franchisees differently from white franchisees, or required Black franchisees to incur greater security or operational costs.

46. "Security costs" also applies to the myriad other costs and profit losses that came with McDonald's redlining a franchisee into low-income neighborhoods. The location McDonald's placed a franchisee dictated the store's profit margins. Owner/operators in low-income neighborhoods were forced to decrease standard prices of food and drink items to sell

16

them, and the customer base in low-income neighborhoods was more likely to buy lower-price items, like a double cheeseburger, as opposed to prices with a higher mark-up, like a drink or fries.

**ANSWER:** Defendants deny the allegations in Paragraph 46 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's engaged in "redlining," made franchising or pricing decisions on the basis of race, or required Black franchisees to operate in low-income neighborhoods or incur different costs or profit margins than other franchisees.

47. Even though white and Black owner/operators had the same products, branding, and experience, white operators were able to charge higher prices and sell far more profitable items, whereas Black owner/operators, including Plaintiff, had to sell less profitable products for lower prices, solely because of their race. To analogize, McDonald's allowed white owner/operators to sell their items at Saks Fifth-Avenue prices and forced Black owner/operators to sell the same items at Walmart prices because of the company's racial discrimination.

**ANSWER:** Defendants deny the allegations in Paragraph 47 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's made franchising, pricing, or operational decisions on the basis of race, treated Black franchisees differently from white franchisees, or required Black franchisees to charge different prices or sell different products because of their race.

48. Again, McDonald's discriminated against Black franchisees by deciding to never subsidize these costs for Black franchisees. McDonald's could have offset the additional costs that Black owner/operators, including Plaintiff, faced by granting rent relief, meaning that it would have charged a lower percentage for rent, but McDonald's did not offer this relief to Black franchisees. At the same time, this practice was commonplace for white operators, as McDonald's often granted them rent relief when they suffered a dip in sales. But McDonald's refused to grant rent relief to Plaintiff, especially as compared to his white counterparts, because of his race.

**ANSWER:** Defendants deny the allegations in Paragraph 48 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's made franchising, rent relief, or cost-subsidy decisions on the

basis of race, treated Black franchisees differently from white franchisees, or denied Plaintiff rent relief because of his race.

49. McDonald's continued its intentional race discrimination against Black franchisees by routinely blocking Black owner/operators, including Plaintiff, from purchasing white franchisees' locations.

**ANSWER:** Defendants deny the allegations in Paragraph 49 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's made franchising or store-purchase decisions on the basis of race, treated Black franchisees differently from white franchisees, or blocked Plaintiff from acquiring the right to operate any McDonald's-branded restaurant because of his race.

50. As a result, McDonald's stuck Black owner/operators, including Plaintiff, in a cycle they could not escape from—placing them in low-income, high-crime areas, forcing them to pay unforeseen security and operational costs, and prohibiting them from purchasing stores in affluent areas that could have helped alleviate the financial burden.

**ANSWER:** Defendants deny the allegations in Paragraph 50 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's made franchising, placement, or operational decisions on the basis of race, treated Black franchisees differently from white franchisees, or placed Plaintiff in any particular location or required him to incur any particular costs because of his race.

51. McDonald's also relied on a well-honed practice of forcing Black owner/operators out of the system, which it applied only to Black owner/operators, including Plaintiff: ramping up unannounced inspections on their stores at all times of the day or night at far greater frequency and with much greater inconvenience than inspections of white franchisees' stores. By increasing inspections, McDonald's had a better chance of finding faults at a Black franchisee's store that they could use to justify deeming them ineligible for expansion or refusing to renew their lease.

**ANSWER:** Defendants deny the allegations in Paragraph 51 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's made inspection, operational, or franchising decisions on the

18

basis of race, treated Black franchisees differently from white franchisees, or used inspections to deny Plaintiff expansion opportunities or lease renewals because of his race.

52.     Even when Black franchisees attempted to sell their stores, McDonald's continued to discriminate against them. Rather than allowing Black franchisees to sell to the highest bidder of their choice, as McDonald's did for white franchisees, McDonald's controlled the sales by forcing Black franchisees of profitable stores (after the franchisees had worked tirelessly to improve operations) to sell to McDonald's-selected white buyers.

**ANSWER:**     Defendants deny the allegations in Paragraph 52 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's made franchising or restaurant transfer decisions on the basis of race, treated Black franchisees differently from white franchisees, or required Plaintiff to transfer or assign the right to operate any McDonald's-branded restaurant to any particular buyer because of his race.

53.     This is not the only evidence that McDonald's knew that it was discriminating against Black franchisees on the basis of their race for McDonald's own financial benefit. In 1996, McDonald's CEO Ed Rensi agreed to implement a program that McDonald's said was intended to establish equity between Black and white franchisees. As part of the program, McDonald's pledged to sell more profitable restaurants to Black franchisees and to offer them temporary rent relief. But McDonald's never followed through on these pledges to rectify the discrimination it knew it was perpetuating. Instead, McDonald's leadership disbanded the program in 2001, unbeknownst to Plaintiff.

**ANSWER:**     Defendants admit only that Ed Resni served as the President and Chief Executive Officer for McDonald's USA in 1996. Defendants deny the remaining allegations in Paragraph 53 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's made franchising, placement, or rent relief decisions on the basis of race, engaged in any discriminatory practices, or implemented or discontinued any program with the purpose or effect of discriminating against Black franchisees.

54. If McDonald's had made any progress to establish equity, it was wiped out when Steve Easterbrook and Chris Kempczinski took the reins as CEO and President of McDonald's USA, respectively, in 2015. Upon assuming the role of CEO, Easterbrook said that the number of Black owner/operators at McDonald's did not matter. This set the stage for the company to eliminate its nascent equity initiatives.

**ANSWER:** Defendants admit only that Steve Easterbrook served as President and Chief Executive Officer for McDonald's Corp. in 2015 and admit that Chris Kempczinski served as President of McDonald's USA in 2015. Defendants deny the remaining allegations in Paragraph 54 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that Defendants made franchising, placement, or policy decisions on the basis of race, eliminated any program for discriminatory reasons, or otherwise engaged in any discriminatory conduct toward Black franchisees.

55. Beginning in 2017, Easterbrook and Kempczinski unveiled the "Bigger Bolder Vision 2020" program with the goal of modernizing 80% of current McDonald's restaurants. The Program would require costly renovations for older restaurants, estimated at as much as $750,000 per store.

**ANSWER:** Defendants admit only that McDonald's introduced its "Bigger Bolder Vison 2020" program beginning in 2017. Defendants deny the remaining allegations in Paragraph 55 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of the program, including any implication that McDonald's USA imposed renovation requirements or associated costs on the basis of race or otherwise treated Black franchisees differently from other franchisees.

56. McDonald's knew that the program would eliminate Black owner/operators from the McDonald's system. That impact was revealed by an impact study conducted by the Boston Consulting Group prior to the program's implementation. Easterbrook and Kempczinski were aware of the results of the impact study and the disproportionate effect Bigger Bolder Vision 2020 would have on Black owner/operators, but they relentlessly pushed it anyway because they wanted to force Black owner/operators to exit the McDonald's system.

**ANSWER:** Defendants deny the allegations in Paragraph 56 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including

any implication that McDonald's made franchising, modernization, or policy decisions on the basis of race, acted with any discriminatory intent or knowledge of discriminatory impact, or sought to force Plaintiff or any other Black franchisee out of the McDonald's USA's franchise system.

57.     Under Easterbrook's and Kempczinski's racially discriminatory tenure as CEO and USA President of McDonald's, respectively, approximately a third of Black owner/operators were forced out of the McDonald's system—a much higher percentage than non-Black operators who left during this time. This exodus of Black franchisees coincided with Easterbrook's decisions to deprioritize Black employees and consumers, including Easterbrook's purge of Black McDonald's employees from positions in senior leadership, an intentional decision to direct advertising budgets away from Black consumers, and the resulting decrease in sales to Black consumers.

**ANSWER:**     Defendants deny the allegations in Paragraph 57 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's USA treated Black franchisees differently from other franchisees or made franchising decisions on the basis of race, or that McDonald's made employment, marketing, or policy decisions on the basis of race or acted with any discriminatory intent toward Plaintiff or any other Black franchisee.

58.     In July 2018, McDonald's USA demoted Senior Executives Vicki Guster-Hines and Domineca Neal, both Black women. Both had relayed or spoken out about Black franchisees being subjected to discriminatory practices, like unfair grading visits. Their demotions were part of McDonald's purge of 43 Black senior executives during Easterbrook's tenure, composing 85% of McDonald's Black employees who were at Executive Director level and above. Guster-Hines and Neal sued McDonald's for discrimination in January 2020.

**ANSWER:**     Defendants admit only that Victoria Guster-Hines and Domineca Neal are former senior directors of McDonald's USA and that they filed a lawsuit against the Defendants in January 2020. Defendants deny the remaining allegations in Paragraph 58 of the Complaint. Answering further, Defendants deny the lawsuit has any merit and deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's made employment, franchising, or policy decisions on the basis of race, retaliated against employees for raising

concerns, engaged in any "purge" of Black executives, or acted with any discriminatory intent toward Plaintiff or any other Black franchisee.

59. The Guster-Hines and Neal complaint revealed inside corporate information to Plaintiff for the first time, including evidence that McDonald's had been systematically and intentionally discriminating against Plaintiff on the basis of his race. Prior to these revelations, McDonald's had caused Black franchisees, including Plaintiff, to believe that McDonald's was treating Black owners/operators the same as white owners/operators.

**ANSWER:** Defendants deny the allegations in Paragraph 59 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's concealed information, mislead franchisees, acted with discriminatory intent, or otherwise treated Plaintiff or any other Black franchisee differently on the basis of race.

60. Compounding the problem, given McDonald's control of information as the franchisor, and given its supposed public commitment to racial equality, Plaintiff was unaware, and could not know or have learned through due diligence, that McDonald's was depriving him of franchise opportunities offered to white franchisees and was otherwise discriminating against him on the basis of his race.

**ANSWER:** Defendants deny the allegations in Paragraph 60 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's USA concealed information from franchisees, misled franchisees, acted with discriminatory intent, or otherwise treated Plaintiff or any other Black franchisee differently on the basis of race.

61. In reality, by 2019, the annual cashflow gap between Black and non-Black franchisees increased to $75,380, up more than $45,000 from 2010.

**ANSWER:** Defendants deny the allegations in Paragraph 61 of the Complaint.

62. Owner/operator Larry Tripplett filed a letter on behalf of the NBMOA to McDonald's East and West Zone Division Presidents, stating that "the trajectory of the treatment of Black Owners is moving backwards. Through no fault of our own we lag behind the general market in all measures." He noted that "[t]he current state of affairs for Black Owners can only be described as hostile" and identified permanent rent reduction as one necessary step, among others.

22

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 62 of the Complaint, and therefore deny them.

63. By 2020, roughly half of Black franchisees had been forced out of the McDonald's system, as compared to only 10% of white owner/operators in the same timeframe. Despite Easterbrook's firing in 2020, Black franchisees' circumstances have not improved under now-CEO Chris Kempczinski.

**ANSWER:** Defendants admit only that Chris Kempczinski has served as President and Chief Executive Officer for McDonald's Corp. since 2019. Defendants deny the remaining allegations in Paragraph 63 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's USA treated Black franchisees differently than any other franchisee or acted with discriminatory intent.

64. McDonald's intentional discrimination is evident in the number of Black franchisees in its system as well. From 1998 to 2020, the number of Black franchisees fell from 377 to 186. Meanwhile, the number of total McDonald's stores doubled from 15,086 to 38,999. Stores owned by Black franchisees only earn about two-thirds of the average McDonald's store.

**ANSWER:** Defendants deny the allegations in Paragraph 64 of the Complaint. Answering further, Defendants deny Plaintiff's characterization of McDonald's historical practices, including any implication that McDonald's USA made franchising, placement, or operational decisions on the basis of race or caused any alleged differences in store performance.

65. Plaintiff's individual experience that follows amplifies that McDonald's purposely treated him worse because he was Black and that McDonald's intentional discrimination caused him massive harm.

**ANSWER:** Defendants deny the allegations in Paragraph 65 of the Complaint. Answering further, Defendants deny any implication that McDonald's USA treated Plaintiff differently from any other franchisee, acted with discriminatory intent, or caused Plaintiff harm on the basis of race.

66.    Plaintiff Mitchell McPherson owned and operated nine stores during his 35-year tenure at McDonald's. He is Black.

**ANSWER:**    Defendants admit only that Plaintiff identifies his race as Black and that he operated, at various times, a total of nine McDonald's-branded restaurant businesses. Defendants deny the remaining allegations in Paragraph 66 of the Complaint.

67.    Plaintiff entered McDonald's registered applicant training program in 1988.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67 of the Complaint, and therefore deny them.

68.    McDonald's offered Plaintiff his first store in 1990, located in LaGrange, New York.

**ANSWER:**    Defendants admit only that Plaintiff's first McDonald's franchise was located in La Grange, New York. Defendants deny the remaining allegations in Paragraph 68 of the Complaint.

69.    The location was in a suburban, upper middle-class area.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 of the Complaint, and therefore deny them.

70.    During his time at the LaGrange, NY location, then-McDonald's Chief Financial Officer Gerry Newman recognized Plaintiff's success, informing him via letter that his store was the most profitable store at its sales level in the country.

**ANSWER:**    Defendants admit only that Gerald Newman served as the Chief Financial Officer for McDonald's Corp. in 1990. Defendants deny the remaining allegations in Paragraph 70 of the Complaint.

71.    In 1995, Plaintiff purchased his second store in the neighboring town of Pleasant Valley, New York.

**ANSWER:**    Defendants admit only that Plaintiff owned and operated a McDonald's franchise in Pleasant Valley, New York. Defendants deny the remaining allegations in Paragraph 71 of the Complaint.

24

72.     In February 2001, McDonald's Field Consultant Ken Green, a white man, visited the store. Plaintiff had faced difficulties staffing the store because of the frequent snowstorms, and the purpose of Green's visit was to provide guidance.

**ANSWER:**     Defendants admit only that Ken Greene served as a Field Operations Consultant for McDonald's Corp. in 2001. Defendants deny the remaining allegations in Paragraph 72 of the Complaint.

73.     After finding a few refrigerated products in the store that were outdated, Green began verbally attacking and swearing at Plaintiff.

**ANSWER:**     Defendants deny the allegations in Paragraph 73 of the Complaint.

74.     Plaintiff told a friend about the incident, who in turn reported it to McDonald's Regional Office. Plaintiff had never heard of Green swearing at a white franchisee in this manner. But for his race, Green would not have sworn and verbally attacked Plaintiff over such a minor issue.

**ANSWER:**     Defendants deny the allegations in Paragraph 74 of the Complaint.

75.     Two weeks later, a McDonald's representative visited Plaintiff's store and apologized for what had happened.

**ANSWER:**     Defendants deny the allegations in Paragraph 75 of the Complaint.

76.     To Plaintiff's knowledge, Green did not receive any consequences for his inappropriate behavior. Yet, following the incident, McDonald's assigned a new consultant to inspect Plaintiff's stores—an African American man.

**ANSWER:**     Defendants deny the allegations in Paragraph 76 of the Complaint.

77.     Shortly after the incident with Green, in 2001, McDonald's began offering Plaintiff opportunities to expand and purchase more stores, in exchange for selling his two New York stores.

**ANSWER:**     Defendants admit only that Plaintiff was offered opportunities to acquire the right to operate additional McDonald's-branded restaurants. Defendants deny the remaining allegations in Paragraph 77 of the Complaint.

78.     Plaintiff agreed and worked to arrange a deal for another owner/operator, Carlos Wong, to purchase his store. Wong happened to be the only other owner/operator of color in Plaintiff's area.

25

**ANSWER:** Defendants admit only that Plaintiff sought to sell one of his McDonald's franchises to Carlos Wong. Defendants deny the remaining allegations in Paragraph 78 of the Complaint.

79. Consistent with McDonald's practice of reserving lucrative stores in predominantly white areas for white franchisees, McDonald's refused to allow Plaintiff's deal to go through with Wong, and instead provided Plaintiff a list of white owner/operators to whom he could sell his stores. Plaintiff was allowed to sell to any white operator in the area, as well as some white operators outside the area.

**ANSWER:** Defendants deny the allegations in Paragraph 79 of the Complaint.

80. Plaintiff sold his two New York stores in 2001 to a white franchisee whom McDonald's had pre-approved.

**ANSWER:** Defendants admit only that Plaintiff sold his two New York McDonald's franchises to another franchisee. Defendants deny the remaining allegations in Paragraph 80 of the Complaint.

81. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's proposed a series of such stores to Plaintiff across the country. McDonald's denied him the opportunity to purchase a store in an affluent white neighborhood solely because of his race.

**ANSWER:** Defendants deny the allegations in Paragraph 81 of the Complaint.

82. The first set of stores McDonald's offered Plaintiff were in a low-income, urban part of Rochester. Plaintiff visited the stores and found them to be in poor condition, in a dangerous neighborhood. Accordingly, he turned them down.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's alleged visit, condition of the restaurants, and the characterization of the neighborhood, and therefore deny them. Defendants deny the remaining allegations in Paragraph 82 of the Complaint.

83. McDonald's then offered Plaintiff a package of five stores in Fort Pierce, Florida, all of which required extensive renovations. McDonald's typical practice was to bring stores up to standard before selling them to a new owner/operator.

**ANSWER:** Defendants deny the allegations in Paragraph 83 of the Complaint.

26

84. McDonald's refused to abide by its standard practice and renovate the stores but continued to push Plaintiff to buy them. Given their condition and McDonald's unwillingness to renovate, Plaintiff refused.

**ANSWER:** Defendants deny the allegations in Paragraph 84 of the Complaint.

85. McDonald's next offered Plaintiff a group of stores in Camden, New Jersey and Philadelphia, Pennsylvania, all of which were in dangerous, low-income areas and in poor condition. Plaintiff refused the offer. The owner/operator who accepted the stores, an African American man, was ultimately shot and killed in one of them.

**ANSWER:** Defendants deny the allegations in Paragraph 85 of the Complaint.

86. In 2001, McDonald's Ombudsman Ron Hawkins offered Plaintiff a six-restaurant package in Baltimore. Three of the restaurants were located in particularly high-crime areas. Moreover, two of those three were in poor condition, and were not operating up to standards.

**ANSWER:** Defendants admit only that Ron Hawkins served as Vice President and National Ombudsman for McDonald's Corp. in 2001 and admit that Plaintiff was offered an opportunity to acquire the right to own and operate six McDonald's franchises in Baltimore, Maryland. Defendants deny the remaining allegations in Paragraph 86 of the Complaint.

87. Plaintiff tried to exclude the two worst stores from the deal, but Hawkins refused, insisting that they must be purchased as a package or not at all. As a result, Plaintiff agreed to purchase the six stores.

**ANSWER:** Defendants admit only that Plaintiff agreed to acquire the right to own and operate six McDonald's franchises. Defendants deny the remaining allegations in Paragraph 87 of the Complaint.

88. Six months after Plaintiff's purchase, McDonald's informed him that they were relocating one of the stores (the "Golden Ring 3512" location) across the street. McDonald's had this information at the time of Plaintiff's purchase but did not disclose it to him.

**ANSWER:** Defendants deny the allegations in Paragraph 88 of the Complaint.

89. The new location was considerably worse—there was restricted access to the restaurant, no signage, and rent would increase from 8.25% to 14%.

**ANSWER:** Defendants deny the allegations in Paragraph 89 of the Complaint.

90.     Plaintiff contacted Ron Hawkins and his NBMOA area representative, protesting the store's construction. However, McDonald's went forward with the construction of the new store and Plaintiff was forced to take it on.

**ANSWER:**     Defendants deny the allegations in Paragraph 90 of the Complaint.

91.     Additionally, McDonald's decided to install a new location next to a Walmart, located 150 yards from the Golden Ring location.

**ANSWER:**     Defendants deny the allegations in Paragraph 91 of the Complaint.

92.     Plaintiff pitched himself to purchase the store, knowing that it would eat into his Golden Ring location's sales. McDonald's denied him the opportunity and decided to run it as a company-owned store before selling it to a white owner/operator. But for Plaintiff's race, McDonald's would have allowed him to purchase it.

**ANSWER:**     Defendants deny the allegations in Paragraph 92 of the Complaint.

93.     In approximately 2002 or 2003, Plaintiff reached an agreement with Jim Schaeffer, a white employee, to become his Director of Operations.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 93 of the Complaint, and therefore deny them.

94.     However, McDonald's Vice President Jim Norberg declined to approve the employment contract. Not long after, McDonald's approved Jim Schaffer to work for a white operator, Michael Meoli. But for Plaintiff's race, McDonald's would have allowed Schaffer to work for him.

**ANSWER:**     Defendants only admit that Jim Norberg served as a Vice President for McDonald's

USA in 2014-2015. Defendants deny the remaining allegations in Paragraph 94 of the Complaint.

95.     Over the next four years, Plaintiff substantially improved the volume of the Baltimore stores. Before his purchase, they were averaging sales below $1.6 million. By 2005, Plaintiff had increased the average to $2.3 million per year.

**ANSWER:**     Defendants deny the allegations in Paragraph 95 of the Complaint.

96.     In 2010, Plaintiff negotiated a deal to acquire three more restaurants in Baltimore from another owner/operator for $5.3 million. The restaurants were near his current restaurants and were highly profitable. Additionally, Plaintiff was eligible for growth at the time and secured financing from Bank of America.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96 of the Complaint, and therefore deny them.

97. McDonald's, specifically QSCVP Wendell Sconiers and Regional Manager Albert Seecharan, refused to approve the purchase, without providing a reason. Plaintiff wrote letters to both individuals, inquiring why they had rejected the purchase but never received a response.

**ANSWER:** Defendants admit only that Wendell Sconiers served as a Vice President of Quality, Service, and Cleanliness for McDonald's USA from September 1, 2005 through December 31, 2012 and admit that Albert Seecharan served as a Vice President and General Manager for McDonald's USA from September 1, 2009 through August 1, 2011. Defendants deny the remaining allegations in Paragraph 97 of the Complaint.

98. Ultimately, McDonald's approved the sale of those three stores to a white operator named Scott Radin.

**ANSWER:** Defendants deny the allegations in Paragraph 98 of the Complaint.

99. But for Plaintiff's race, McDonald's would have approved the sales of these stores and allowed Plaintiff the opportunity to acquire profitable locations.

**ANSWER:** Defendants deny the allegations in Paragraph 99 of the Complaint.

100. Near the end of 2012 or the beginning of 2013, Plaintiff purchased his seventh store in Baltimore (National Store 2606 or "Howard Street"). At that point, Plaintiff was desperate for growth opportunity and settled for a low-volume store.

**ANSWER:** Defendants admit only that on December 18, 2012, Plaintiff acquired the right to own and operate a seventh McDonald's franchise in Baltimore. Defendants deny the remaining allegations in Paragraph 100 of the Complaint.

101. This store was in a worse location, in poorer condition, and in a higher-crime area than his other Baltimore stores.

**ANSWER:** Defendants deny the allegations in Paragraph 101 of the Complaint.

102. In 2013, Plaintiff was assigned a new Field Consultant, Jawad Huleis.

**ANSWER:** Defendants deny the allegations in Paragraph 102 of the Complaint.

103.    A fellow owner/operator warned Plaintiff that when McDonald's assigned Huleis as an operator's Field Consultant, it means they want to force the operator out of the system.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 of the Complaint, and therefore deny them.

104.    Plaintiff was plagued with security issues at his stores in Baltimore. In 2013, one of his employees was shot in the head outside the Hartford Road location after ending his shift at midnight.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104 of the Complaint, and therefore deny them.

105.    In February 2013, the day of the Ravens' Super Bowl parade, a man was stabbed in front of Plaintiff's Howard Street store. He then ran into the store, collapsed, and died.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105 of the Complaint, and therefore deny them.

106.    In one incident, an employee was attacked and seriously injured in the store's lobby. At another point, a customer entered the store and threatened an employee at gunpoint for not putting enough caramel sauce on his sundae.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106 of the Complaint, and therefore deny them.

107.    In February 2016, Plaintiff informed Huleis that the police had asked him to close his Theatre District location due to a stabbing across the street.

**ANSWER:**    Defendants deny the allegations in Paragraph 107 of the Complaint.

108.    During Plaintiff's tenure at the Northwood Plaza National location, two murders took place at the plaza, including one in which City Councilman Ken Harris was killed.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 of the Complaint, and therefore deny them.

109.    At Plaintiff's Howard Street location, an employee was almost stabbed a few days after she refused to give free food to a person demanding it and another employee was brutally attacked.

30

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109 of the Complaint, and therefore deny them.

110. Plaintiff himself faced threats on his own life and those of his family members on at least three occasions between 2019 and 2021.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110 of the Complaint, and therefore deny them.

111. Plaintiff is not aware of any white operator who experienced threats to their lives or their family's lives.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 of the Complaint, and therefore deny them.

112. Plaintiff reported every safety and security incident to McDonald's Corporation.

**ANSWER:** Defendants deny the allegations in Paragraph 112 of the Complaint.

113. He begged McDonald's, via Regional Manager Harry Thomas, to take the Howard Street store back, telling them that he had never imagined that selling hamburgers would cost people their lives.

**ANSWER:** Defendants admit only that Harry Thomas served as a Field Vice President for McDonald's Corp. from July 2018 to March 2022. Defendants deny the remining allegations in Paragraph 113 of the Complaint.

114. McDonald's refused to take the store back and told Plaintiff simply that these security issues were the normal course of doing business.

**ANSWER:** Defendants deny the allegations in Paragraph 114 of the Complaint.

115. Plaintiff was consistently questioned and ignored by McDonald's when he reported his safety and security concerns.

**ANSWER:** Defendants deny the allegations of Paragraph 115 of the Complaint.

116. In 2015, Vice President of Development and Construction David Nyst visited Plaintiff's North Ave. store after Plaintiff had reported severe construction defects at the location.

31

McDonald's had shown no interest in fixing the store's construction issues since the rebuild in 2008. By 2015, the issues had become so severe that ceramic tiles were falling off the walls and one of the store's employees narrowly avoided a serious injury.

**ANSWER:** Defendants deny the allegations in Paragraph 116 of the Complaint.

117. Upon arriving at the store, rather than responding to the construction issues, Nyst began verbally attacking Plaintiff and sticking his finger in Plaintiff's face.

**ANSWER:** Defendants deny the allegations in Paragraph 117 of the Complaint.

118. Rattled by Nyst's behavior, Plaintiff called Field Service Manager Karen Paine to report what had happened with Nyst. Plaintiff never received an apology from Nyst or on his behalf, and Nyst never faced consequences for his verbal abuse. Plaintiff never heard of Nyst similarly yelling at any white franchisees. But for his race, Nyst would not have yelled at Plaintiff in this manner.

**ANSWER:** Defendants admit only that Karen Paine served as a Field Operations Manager for

McDonald's Corp. from 2005-2012. Defendants deny the remaining allegations in Paragraph 118

of the Complaint.

119. Throughout his tenure, Plaintiff requested rent relief on his Baltimore stores, given that they were low volume and making much less money than white owner/operators' stores in the area.

**ANSWER:** Defendants admit only that Plaintiff requested rent relief for his Baltimore

franchises. Defendants deny the remaining allegations in Paragraph 119 of the Complaint.

120. McDonald's denied Plaintiff's requests for rent relief, stating simply that his stores were making enough money. However, the company granted such relief to white owner/operators.

**ANSWER:** Defendants deny the allegations in Paragraph 120 of the Complaint.

121. When Bigger Bolder Vision was launched in 2020, the guidelines for passing company graded visits became more stringent. But after the outbreak of the COVID-19 pandemic in March 2020, McDonald's announced that it was pausing inspections at restaurants across the country.

**ANSWER:** Defendants admit only that McDonald's USA launched a strategic initiative titled

"Bigger, Bolder Vision" in 2020. Defendants deny the remaining allegations in Paragraph 121 of

the Complaint.

32

122. Still, McDonald's Field Consultant Jawad Huleis continued to inspect Plaintiff's restaurants.

**ANSWER:** Defendants deny the allegations in Paragraph 122 of the Complaint.

123. Plaintiff told the NBMOA that inspections were continuing at his restaurants and they relayed this concern to McDonald's on Plaintiff's behalf.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 123 of the Complaint, and therefore deny them.

124. Additionally, Plaintiff discussed the continuing inspections with Regional Manager Harry Thomas who explained that the inspections were continuing because Plaintiff's restaurants had health department issues and had been closed by the health department.

**ANSWER:** Defendants admit only that Harry Thomas served as a Field Vice President for

McDonald's Corp. from July 2018 to March 2022. Defendants deny the remaining allegations in

Paragraph 124 of the Complaint.

125. None of this was true.

**ANSWER:** Defendants deny the allegations in Paragraph 125 of the Complaint.

126. After speaking with Thomas, Plaintiff checked the health department website for closures in Baltimore, which provides a 5-year record of restaurant closures in the city. None of his restaurants were listed.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 126 of the Complaint, and therefore deny them.

127. Plaintiff did not know of any white owner/operators who continued to have inspections at the time.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 127 of the Complaint, and therefore deny them.

128. Indeed, a white owner/operator in the neighborhood, Scott Radin, who also had Huleis as his consultant had 5 or 6 health department closures at his stores in the past. Huleis did not conduct inspections of Radin's restaurants during the pandemic. During this time, Radin added between 8 to 13 stores to his portfolio.

33

**ANSWER:** Defendants deny the allegations in Paragraph 128 of the Complaint.

129. This divergence demonstrates that McDonald's employed a different standard for Plaintiff, a Black franchisee, and Radin, a white franchisee. But for Plaintiff's race, Huleis would not have continued to inspect his restaurants during a time when inspections were paused across the country.

**ANSWER:** Defendants deny the allegations in Paragraph 129 of the Complaint.

130. On one occasion when Huleis could not conduct the inspection because he was on vacation, McDonald's sent another consultant to inspect Plaintiff's stores. Under the new consultant, Plaintiff's stores passed with flying colors—they were graded at 90%+.

**ANSWER:** Defendants deny the allegations in Paragraph 130 of the Complaint.

131. It became clear that Huleis was targeting Plaintiff's store because McDonald's wanted to force him out of the system.

**ANSWER:** Defendants deny the allegations in Paragraph 131 of the Complaint.

132. In February 2021, Plaintiff participated in a video broadcast about reconstructing one of his restaurants, #12239, with McDonald's corporate employee Matt Cullen, Director of Development Brian Tabb, Regional Manager Harry Thomas, East Division President Mario Barbosa, and Director of Finance Matt Knadler.

**ANSWER:** Defendants admit only that Matt Cullen is employed by McDonald's Corp. and admit that Brian Tabb served as Director of Development, Harry Thomas served as a Field Vice President, Mario Barbosa served as Zone President East, and Matt Knadler served as a Field Finance Officer for McDonald's USA in 2021. Defendants deny the remaining allegations in Paragraph 132 of the Complaint.

133. During the video broadcast, Cullen mocked Plaintiff's speech impediment and mimicked his stutter.

**ANSWER:** Defendants deny the allegations in Paragraph 133 of the Complaint.

134. Plaintiff felt deeply humiliated and embarrassed during and after the meeting.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134 of the Complaint, and therefore deny them.

34

135. After consulting with a fellow owner/operator, Plaintiff called the regional Vice President of Operations Lynn Rudy to express how hurt he was by Cullen's conduct.

**ANSWER:** Defendants admit only that Lynn Rudy has served as an Operations Officer for McDonald's USA since January 2019, and admit that Plaintiff placed a telephone call to her. Defendants deny the remaining allegations in Paragraph 135 of the Complaint.

136. Rudy, who had attended the video broadcast, provided no response, nor did Thomas or Barbosa.

**ANSWER:** Defendants deny the allegations in Paragraph 136 of the Complaint.

137. Plaintiff followed up by sending a letter to Rudy complaining about the incident, as well as sending a letter to Regional Manager Bill Garrett.

**ANSWER:** Defendants deny the allegations in Paragraph 137 of the Complaint.

138. Plaintiff never heard back from Rudy or Garrett and never received an apology. As far as he is aware, Cullen never faced any consequences for publicly humiliating Plaintiff. Were it not for Plaintiff's race, Cullen would not have mocked or disrespected him in such a manner.

**ANSWER:** Defendants lack knowledge of information sufficient to form a belief as to the truth of the allegations in Paragraph 138 of the Complaint, and therefore deny them.

139. Plaintiff had to receive both mental and medical treatment as a result of this incident.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139 of the Complaint, and therefore deny them.

140. By 2021, the discriminatory and unwarranted inspections of Plaintiff's stores had become too onerous for Plaintiff to continue operations.

**ANSWER:** Defendants deny the allegations in Paragraph 140 of the Complaint.

141. Plaintiff had informed members of McDonald's executive-level management that he was being treated unfairly, including Senior Vice President of Operations Bill Garrett, President of McDonald's East Division Mario Barbosa, USA Senior Vice President of Human Resources Candace Jean-Louis, Vice President of Diversity and Ombudsman Bill Lowery, Vice President and General Manager Harry Thomas, and Vice President of Global Diversity and Inclusion Reggie Miller.

**ANSWER:** Defendants deny the allegations in Paragraph 141 of the Complaint.

142. No one ever responded to his concerns.

**ANSWER:** Defendants deny the allegations in Paragraph 142 of the Complaint.

143. Plaintiff's three remaining stores were all in low-income, high-crime areas. When Plaintiff approached McDonald's about selling his remaining stores, they directed him to buyers who were all Black or people of color.

**ANSWER:** Defendants deny the allegations in Paragraph 143 of the Complaint.

144. As a result of the discrimination he endured at McDonald's, Plaintiff suffered and continues to suffer from chronic headaches, anxiety, and weight gain.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144 of the Complaint, and therefore deny them.

145. But for his race, McDonald's would not have subjected Plaintiff to increased inspections and failed him on every inspection.

**ANSWER:** Defendants deny the allegations in Paragraph 145 of the Complaint.

146. But for his race, Plaintiff would have remained in the McDonald's system, to which he had dedicated 35 years of his life.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146 of the Complaint, and therefore deny them.

## CAUSES OF ACTION

### COUNT I

### 42 U.S.C. § 1981—Race Discrimination in Contracting

147. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** Defendants deny the allegations in Paragraph 147 of the Complaint to the extent they purport to incorporate by reference the allegations of the preceding paragraphs. Defendants reassert their responses to those paragraphs as though fully set forth herein.

148. Plaintiff is a member of the class protected by this statute, in that Plaintiff is Black.

36

**ANSWER:** Defendants admit only that Plaintiff identifies his race as Black. To the extent that Paragraph 148 contains statements or conclusions of law, no response is required. Defendants deny the remaining allegations in Paragraph 148 of the Complaint.

149. As described in greater detail above, Defendants intentionally discriminated against Plaintiff on the basis of his race in their making, performance, modification and/or termination of their franchisor/franchisee contractual relationship with Plaintiff. In doing so, Defendants denied Plaintiff the enjoyment of the benefits, privileges, terms, and conditions of this contractual relationship.

**ANSWER:** Defendants deny the allegations in Paragraph 149 of the Complaint.

150. If it were not for Defendants' intentional race discrimination, Plaintiff would not have suffered the harms discussed in this Complaint.

**ANSWER:** Defendants deny the allegations in Paragraph 150 of the Complaint.

151. As described in greater detail above, Defendants intentionally discriminated against Plaintiff on the basis of his race by engaging in misconduct such as:
   a. forcing Plaintiff to franchise locations that were less profitable, located in lower-income or higher-crime neighborhoods, and in poorer physical condition than the franchise locations made available to white franchisees;
   b. denying Plaintiff access to profitable franchise locations that were made available to white franchisees;
   c. targeting Plaintiff for unfair and unreasonable inspections, in a manner that was not reflected in Defendants' franchisor/franchisee relationship with white franchisees;
   d. denying Plaintiff the benefit of programs and opportunities that were offered to white franchisees; and
   e. denying Plaintiff's requests to sell their franchises to the buyer of their choosing at a favorable negotiated price, in a manner that was not reflected in Defendants' approval decisions with respect to the sale of white-owned franchises.

**ANSWER:** Defendants deny the allegations in Paragraph 151 of the Complaint.

152. As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Defendants deny the allegations in Paragraph 152 of the Complaint.

## COUNT II

### 42 U.S.C. § 1981—Race Discrimination in Contracting (Pattern or Practice)

153. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 153 of the Complaint to the extent they purport to incorporate by reference the allegations of the preceding paragraphs and reassert their responses to those paragraphs as though fully set forth herein.

154. Plaintiff is a member of the class protected by this statute, in that Plaintiff is Black.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants admit only that Plaintiff identifies his race as Black. To the extent that Paragraph 154 contains statements or conclusions of law, no response is required, and Defendants deny the remaining allegations in Paragraph 154 of the Complaint.

155. Defendants' misconduct alleged in Count I, and as described in greater detail above, was part of a pattern or practice of discriminatory decision-making, pursuant to which Defendants regularly and purposefully discriminated against Black franchisees.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 155 of the Complaint.

156. This discriminatory pattern or practice was so pervasive that it amounted to the Defendants' standard operating procedure with regard to their treatment of Black franchisees.

Defendants' discriminatory pattern and practice includes, as alleged above: forcing Black franchisees to locations that were less profitable than locations offered to white franchisees; unfairly applying standards to Black franchisees that Defendants did not apply to white franchisees; and refusing to agree Black franchisees' proposed sales of their stores and instead forcing Black franchisees to sell to Defendants' preferred purchasers when Defendants did not impose such conditions on white franchisees.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 156 of the Complaint.

157. As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 157 of the Complaint.

### COUNT III

### 42 U.S.C. § 1982—Discrimination in the Leasing of Real Property

158. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** Defendants deny the allegations in Paragraph 158 of the Complaint to the extent they purport to incorporate by reference the allegations of the preceding paragraphs. Defendants reassert their responses to those paragraphs as though fully set forth herein.

159. Plaintiff is a member of the class protected by this statute, in that Plaintiff is Black.

39

**ANSWER:** Defendants admit only that Plaintiff identifies his race as Black. To the extent that Paragraph 159 contains statements or conclusions of law, no response is required. Defendants deny the remaining allegations in Paragraph 159 of the Complaint.

160. As described in greater detail above, Defendants intentionally discriminated against Plaintiff on the basis of his race in the leasing of real property, including but not limited to: Defendants refused to lease favorable, more profitable restaurant locations to Plaintiff which Defendants made available to white franchisees; Defendants forced Plaintiff to less profitable, lower quality restaurant locations; and Defendants unfairly and unreasonably denied Plaintiff's requests to sell his franchises and transfer his interest in real property to the buyers of his choosing at a favorable negotiated price.

**ANSWER:** Defendants deny the allegations in Paragraph 160 of the Complaint.

161. If it were not for Defendants' intentional race discrimination, Plaintiff would not have suffered the harms discussed in this Complaint.

**ANSWER:** Defendants deny the allegations in Paragraph 161 of the Complaint.

162. As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Defendants deny the allegations in Paragraph 162 of the Complaint.

## COUNT IV

**42 U.S.C. § 1982—Discrimination in the Leasing of Real Property (Pattern or Practice)**

163. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 163 of the Complaint to the extent they purport to incorporate by reference the allegations of the preceding paragraphs and reassert their responses to those paragraphs as though fully set forth herein.

40

164.   Plaintiff is a member of the class protected by this statute, in that Plaintiff is Black.

**ANSWER:**   Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants admit only that Plaintiff identifies his race as Black. To the extent that Paragraph 164 contains statements or conclusions of law, no response is required, and Defendants deny the remaining allegations in Paragraph 164 of the Complaint.

165.   Defendants' misconduct alleged in Count III, and as described in greater detail above, was part of a pattern or practice of discriminatory decision-making, pursuant to which Defendants regularly and purposefully discriminated against Black franchisees.

**ANSWER:**   Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 165 of the Complaint.

166.   This discriminatory pattern or practice was so pervasive that it amounted to the Defendants' standard operating procedure with regard to their treatment of Black franchisees. Defendants' discriminatory pattern and practice includes, as alleged above: forcing Black franchisees to locations that were less profitable than locations offered to white franchisees; refusing to allow Black franchisees to lease locations that were more profitable and only providing white franchisees the opportunity to lease such locations; and refusing to agree Black franchisees' proposed sales of their stores and instead forcing Black franchisees to sell to Defendants' preferred purchasers when Defendants did not impose such conditions on white franchisees.

**ANSWER:**   Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 166 of the Complaint.

167.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation,

emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 167 of the Complaint.

### COUNT V

### Illinois State Law—Breach of Contract

168.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER:**     Defendants deny the allegations in Paragraph 168 of the Complaint to the extent they purport to incorporate by reference the allegations of the preceding paragraphs. Defendants reassert their responses to those paragraphs as though fully set forth herein.

169.     Plaintiff had a valid and enforceable written contract with Defendants.

**ANSWER:**     Defendants admit only that Plaintiff entered into one or more franchise agreements with McDonald's USA. To the extent Paragraph 169 characterizes those agreements, asserts legal conclusions regarding their validity or enforceability, or otherwise misstates their terms, no response is required. Defendants deny the remaining allegations in Paragraph 169 of the Complaint.

170.     Plaintiff performed his obligations under the contract.

**ANSWER:**     Defendants deny the allegations in Paragraph 170 of the Complaint.

171.     As described in greater detail above, Defendants breached the contract by failing to perform their obligations under the contract.

**ANSWER:**     Defendants deny the allegations in Paragraph 171 of the Complaint.

172.     As described in greater detail above, among the contractual obligations that Defendants breached was their obligation to make available to Plaintiff the same services,

facilities, rights, and privileges with respect to their operation of McDonald's franchises as Defendants made generally available to other franchisees, specifically white franchisees. Section 3 of the Franchise Agreement provides that McDonald's must "make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants." (Franchise Agreement ¶ 3) (emphasis added). McDonald's breached this obligation by, among other things: not providing Plaintiff the rent relief and other financial assistance Defendants provided to white franchisees and conducting reviews of Plaintiff's restaurants at unreasonable times and under unreasonable circumstances that Defendants did not impose on white franchisees.

**ANSWER:** Defendants deny the allegations in Paragraph 172 of the Complaint.

173. In addition, Defendants agreed to conduct reviews of Plaintiff's restaurants only at "reasonable times to ensure that [the] Franchisee's operation" complied with McDonald's standards and policies. (Franchise Agreement ¶ 12) (emphasis added). Defendants breached this obligation by conducting reviews of Plaintiff's restaurants at unreasonable times and under unreasonable circumstances, including during the outbreak of the COVID-19 pandemic, when it had paused inspections nationwide.

**ANSWER:** Defendants deny the allegations in Paragraph 173 of the Complaint.

174. Further, Defendants agreed that "consent shall not be arbitrarily withheld" when Plaintiff attempted to sell his stores. Franchise Agreement § 15(d). Defendants breached this obligation when they arbitrarily refused to accept the terms of sale proposed by Plaintiff when he attempted to sell his New York stores to a fellow owner/operator, and when Defendants insisted that Plaintiff sell his stores to buyers hand-picked by Defendants.

**ANSWER:** Defendants deny the allegations in Paragraph 174 of the Complaint.

175. As a result of Defendants' breach of contract described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Defendants deny the allegations in Paragraph 175 of the Complaint.

### COUNT VI

**Illinois State Law—Tortious Interference with Business Relationships**

176. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

43

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 176 of the Complaint to the extent they purport to incorporate by reference the allegations of the preceding paragraphs and reassert their responses to those paragraphs as though fully set forth herein.

177.     As described in greater detail above, as a result of his status as a McDonald's franchisee, Plaintiff had valid business relationships with one or more individuals or entities, including but not limited to fellow franchisees with stores for sale.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 177 of the Complaint.

178.     Defendants had knowledge of these business relationships.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 178 of the Complaint.

179.     As described in greater detail above, Defendants, without any justification, intentionally interfered with these business relationships, including but not limited to their racially discriminatory conduct and breach of contract alleged in the Counts above.

**ANSWER:** Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 179 of the Complaint.

180.    As a result of Defendants' interference with business relationships described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**    Defendants note that this claim was dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, *see* Dkt. No. 43, and therefore no response is required, *see* n.1 *supra*. To the extent any response is deemed necessary, Defendants deny the allegations in Paragraph 180 of the Complaint.

## PRAYER FOR RELIEF

**ANSWER:**    Defendants, having fully answered Plaintiff's Complaint, admit only that Plaintiff seeks the relief described in the Complaint, but deny the substantive allegations of the Complaint upon which such relief is based and further deny that Plaintiff is entitled to any of the relief sought.

## JURY DEMAND

**ANSWER:**    Defendants admit only that Plaintiff has demanded a jury trial on the issues raised in the Complaint, but deny any such trial is warranted or that Plaintiff is entitled to any relief.

## AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Without assuming any burden of proof on any matter for which Plaintiff bears the burden, Defendants assert the following affirmative defenses. Defendants incorporate by reference their responses, admissions, and denials set forth in this Answer solely to the extent such matters support or provide context for the affirmative defenses stated below.

## FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitation governing discrimination claims, contract claims, and any tort-based theories. Defendants assert

45

this defense consistent with the Court's ruling on Defendants' Motion to Dismiss, which dismissed certain claims and limited the temporal scope of others. *See* Dkt. No. 43; *see also* n.1 *supra*.

## SECOND DEFENSE

The Complaint, and each purported cause of action therein, fails to state a claim upon which relief may be granted.

## THIRD DEFENSE

McDonald's Corporation and McDonald's USA, LLC are separate legal entities. Plaintiff has not alleged facts sufficient to disregard the corporate form, pierce the corporate veil, or impose liability on one entity for the acts or omissions of the other. To the extent that Plaintiff seeks to hold McDonald's Corporation liable for franchisor-level decisions made by McDonald's USA, such claims fail as a matter of law.

## FOURTH DEFENSE

To the extent Plaintiff assets contract-based claims against McDonald's Corporation, such claims fail because McDonald's Corporation was not a party to any franchise agreement, lease, or related contract with Plaintiff and owed no contractual duties to him.

## FIFTH DEFENSE

Any actions taken by Defendants were based on legitimate, non-discriminatory business reasons, including operational, financial, performance, and system-wide considerations applicable to all franchisees.

## SIXTH DEFENSE

Even assuming arguendo that an impermissible factor played a role in any challenged decision (which Defendants deny), Defendants would have taken the same actions for legitimate,

non-discriminatory, and non-retaliatory reasons or for good cause consistent with the franchise agreements and system standards.

## SEVENTH DEFENSE

Defendants did not breach any provision of any franchise agreement, lease, or related document.

## EIGHTH DEFENSE

Plaintiff failed to perform his own contractual obligations, failed to satisfy conditions precedent and/or materially breached the franchise agreement(s), thereby excusing any alleged performance by Defendants.

## NINTH DEFENSE

Any injuries or damages alleged by Plaintiff were caused, in whole or in part, by Plaintiff's own conduct, decisions, business practices, operational deficiencies, or failures to comply with system standards.

## TENTH DEFENSE

Plaintiff failed to meet Defendants' operational, financial, quality, or performance standards, and any actions taken by Defendants were justified, contractually authorized, and consistent with system-wide standards.

## ELEVENTH DEFENSE

Plaintiff cannot identify any similarly situated franchisees outside his protected class who were treated more favorably under comparable circumstances.

47

**TWELFTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by waiver, abandonment, acquiescence, or failure to timely assert rights allegedly available under the franchise agreements or applicable law.

**THIRTEENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel, including but not limited to Plaintiff's own representations, omissions, conduct, and acceptance of benefits.

**FOURTEENTH DEFENSE**

To the extent Plaintiff executed any releases, acknowledgements, or agreements in connection with receiving discretionary benefits—including but not limited to rent relief, financial assistance, or other support—Plaintiff's claims are barred, in whole or in part, by such releases.

**FIFTEENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands, including Plaintiff's own conduct, omissions, or failures to comply with contractual and system obligations.

**SIXTEENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches due to Plaintiff's unreasonable delay in asserting rights and the resulting prejudice to Defendants.

**SEVENTEENTH DEFENSE**

Plaintiff's alleged damages including but not limited to lost profits, lost opportunities, valuation assumptions, reputational harm, and alleged emotional injuries are speculative, unsupported, not recoverable as a matter of law, or barred by contractual limitations.

**EIGHTEENTH DEFENSE**

Plaintiff cannot establish that any act or omission by Defendants caused the alleged injuries. Any alleged damages are remote, speculative, not proximately caused by Defendants, or attributable to intervening or superseding causes.

**NINETEENTH DEFENSE**

Plaintiff seeks damages that were not reasonably foreseeable, are remote, or fall outside the recoverable damages under applicable law.

**TWENTIETH DEFENSE**

Plaintiff failed to take reasonable steps to mitigate any alleged damages and any recovery must be reduced or barred accordingly.

**TWENTY-FIRST DEFENSE**

Defendants reserve the right to rely on after-acquired evidence demonstrating that Plaintiff engaged in conduct that would have independently justified the actions challenged in the Complaint.

**TWENTY-SECOND DEFENSE**

Plaintiff's request for punitive or exemplary damages is barred to the extent it seeks such damages for breach of contract or any other claim for which punitive damages are not legally available.

**TWENTY-THIRD DEFENSE**

Plaintiff's request for punitive or exemplary damages is barred, in whole or in part, by the Due Process Clause of the United States Constitution and any other applicable constitutional provisions, including protections against excessive fines. Any award of punitive damages would be excessive, arbitrary, disproportionate to any actual harm, and unconstitutional.

## TWENTY-FOURTH DEFENSE

To the extent that the franchise agreements contain limitations on damages, remedies, or available relief, Plaintiff's claims are barred or limited by those contractual provisions.

## TWENTY-FIFTH DEFENSE

Defendants acted at all times in good faith and in accordance with the implied covenant of good faith and fair dealing.

## TWENTY-SIXTH DEFENSE

To the extent Plaintiff asserts obligations beyond the express terms of the franchise agreements, such claims are barred because Defendants owed no duty beyond the contract.

## TWENTY-SEVENTH DEFENSE

To the extent Plaintiff seeks tort-based damages arising from alleged contractual duties, such claims are barred by the economic loss doctrine.

## TWENTY-EIGHTH DEFENSE

To the extent the franchise agreements contain arbitration provisions, dispute-resolution requirements, or mandatory pre-suit procedures, Plaintiff's claims are barred or must be resolved in accordance with those provisions.

## TWENTY-NINTH DEFENSE

All claims previously dismissed by the Court pursuant to its ruling on Defendants' Motion to Dismiss, including Plaintiff's pattern-and-practice claims and tortious interference claim, are not properly before the Court and cannot serve as a basis for liability or damages. (Dkt. No. 43).

## THIRTIETH DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrine of forum non conveniens. Many of the relevant witnesses, documents, and operative events are located outside

50

this District, and litigating here would impose undue burden and expense inconsistent with the interests of justice. Defendants assert this defense to preserve all objections to the selection of this forum and to maintain their right to seek dismissal or transfer pursuant to 28 U.S.C. § 1404 or applicable law should the facts developed in discovery warrant such relief.

WHEREFORE, Defendants McDonald's USA, LLC and McDonald's Corporation request that the Court enter judgment as follows:

1. Dismissing with prejudice the Complaint in its entirety against McDonald's USA, LLC and McDonald's Corporation;

2. Granting McDonald's USA, LLC and McDonald's Corporation an award of attorneys' fees, costs, and disbursements incurred in this action; and

3. Granting such other relief as the Court deems just and proper.

Dated: May 8, 2026

Respectfully submitted,

/s/ Patricia Brown Holmes

Patricia Brown Holmes
Amy C. Andrews
Mary A. Laird
Nathan A. Shine
RILEY SAFER HOLMES & CANCILA LLP
1 South Dearborn Street, Suite 2200
Chicago, Illinois 60603
(312) 471-8700
pholmes@rshc-law.com
aandrews@rshc-law.com
mlaird@rshc-law.com
nshine@rshc-law.com

*Counsel for McDonald's USA, LLC and McDonald's Corporation*